[712 NYS2d 452]

CHEMICAL BANK, Appellant-Respondent, v STANLEY STAHL et al., Respondents-Appellants.

STANLEY STAHL, Respondent-Appellant, v CHEMICAL BANK, Appellant-Respondent.

First Department, July 20, 2000

### APPEARANCES OF COUNSEL

*Michael F. Coyne* of counsel (*Michael A. O'Connor, Janis G. White* and *Nancy E. Schwarzkopf* on the brief; *The Chase Manhattan Legal Department,* formerly known as *Chemical Bank,* attorneys), for appellant-respondent.

*Dean G. Yuzek* of counsel (*David Rosenberg* on the brief; *Ingram Yuzek Gainen Carroll & Bertolotti, L. L. P.,* and *Marcus Rosenberg & Diamond, L. L. P.,* attorneys), for Stanley Stahl, respondent-appellant.

### OPINION OF THE COURT

Tom, J.

These two consolidated actions, which concern tenant exit work for certain vacated premises previously leased by plaintiff

Chemical Bank, have generated numerous proceedings and appeals since 1994. Chase Manhattan Bank, formerly known as Chemical Bank, is the plaintiff tenant in action A and defendant tenant in action B. Stanley Stahl and his business personification Stahl Park Avenue Company are the defendant landlord in action A and plaintiff landlord in action B. The leased premises were at 277 Park Avenue, Manhattan, in which the bank, occupying some 800,000 square feet of space, was the anchor tenant pursuant to several consecutive commercial leases that extended the tenancy from 1961 to 1994 and occasionally expanded the demised floor space. During the 1980's, the premises apparently served as Chemical Bank's world headquarters. This tenant purportedly spent some $70 million in alterations and improvements on the demised premises. Since much of the renovation work was not allowed under the lease, the landlord's permission was requested, and obtained, conditioned, in a consent agreement, upon specified "exit work." The parties in these actions dispute the extent and nature of the exit work required of the tenant prior to vacating. More specifically, the parties dispute whether the bank is liable for the cost of the asbestos abatement work that may have been necessitated by the exit work, and whether the bank is liable for the cost of also abating allegedly illegal fireproofing installed by the bank in the 1980's.

The tenancy was governed by a series of lease agreements and supplements thereto dated between April 27, 1961 and July 31, 1989. It appears to be undisputed that the original 1961 lease provided the basic template for the tenancy, although a July 30, 1965 fourth supplementary agreement and the July 29, 1980 consent agreement materially modified that lease as to matters that have relevance for this appeal.

The lease did not impose any general obligation on the tenant, upon its vacating, to physically restore the premises. However, lease paragraphs 20.02 and 26.07, paragraph 14 of the fourth supplementary agreement and paragraph 2 of the consent agreement affirmatively provided for exit work.

The bank's obligation to perform tenant exit work was subject to notice requirements for both parties. The leases and the consent agreement required the bank to inform the landlord of property and improvements that the bank did not intend to remove from the premises upon vacating. The landlord was then required to notify the bank, by a specified deadline, of the improvements the bank was required to remove.

The bank's tenancy, which had commenced during the early 1960's, lasted until 1994 when the tenant, after its merger with Manufacturers Hanover, relocated. The bank gave landlord written notice in March and April 1993 that it did not intend to remove any of its property or improvements other than movable furnishings. By letter dated November 15, 1993, the landlord demanded certain exit work which is the subject of dispute in these appeals.

In response to the landlord's demand, the bank delivered to landlord plans and specifications for the work that the bank deemed eligible tenant exit work. The submissions included plans and specifications for asbestos work that the contemplated tenant exit work might necessitate. The bank also submitted governmental forms, including a zoning law compliance statement, requiring the landlord's signature for the bank to perform the work lawfully. It is undisputed that the landlord refused to sign the governmental forms required to allow the work to go forward, based on landlord's assertion that the bank's proposed plans and specifications for the tenant's proposed exit work, including the plans for attendant asbestos abatement, were "inadequate." In addition, by letter dated January 3, 1994, the landlord gave the bank a purported "Default Notice," based on certain fireproofing the bank had installed in the early 1980's that allegedly violated the New York City Building Code.

After numerous letters between the parties with no resolution, the bank stated that it could not proceed with the exit work due to landlord's failure to provide a signed statement concerning zoning law compliance. The bank vacated the premises in July 1994 without performing any tenant exit work.

The bank instituted action A in January 1994. The bank's amended complaint seeks declarations that the bank did not breach the leases as purported in landlord's notice of default based on the allegedly illegal fireproofing, that the bank is not obligated to perform asbestos abatement or refireproofing work at the premises, and that landlord's refusal to allow the bank to undertake tenant exit work discharged the bank's obligation to perform such work.

The landlord commenced action B in January 1995, asserting, *inter alia*, causes of action for breach of contract based on the bank's failure to perform tenant exit work and its installation of the allegedly illegal fireproofing, and for common law indemnification of the costs for removing such fireproofing. Ac-

tion A and action B were consolidated, with the bank designated as plaintiff.

These appeals arise from the motion court's disposition of the parties' respective motions for summary judgment. The bank moved for summary judgment dismissing all claims and defenses asserted by the landlord. The bank also sought a declaration that the landlord, by his actions and failures to act, waived any exit work that may have been required in the lease agreements and that the bank did not have any duty to undertake asbestos remediation in connection with its exit from the subject premises. The landlord moved for summary judgment dismissing the bank's action and its affirmative defense of waiver. In addition, the landlord cross-moved for partial summary judgment as to the bank's liability regarding the alleged defective fireproofing.

In entertaining the parties' motions, the court dated accrual of the cause of action for breach of contract in connection with the allegedly unlawful installation of the fireproofing to the 1984 installation, and dismissed the landlord's 1994 fireproofing claim as time barred. The court also concluded that removal of the fireproofing was not exit work, and as such would not have the benefit of the 1994 accrual date. The court also dismissed the indemnification claim relating to fireproofing, which it characterized as a mere relabeling of the lapsed breach of contract claim. To the extent that the claim for asbestos abatement related to the fireproofing, it, too, was held time barred for similar reasons. However, to the extent that abatement was necessitated by the exit work disturbing the asbestos, the claim would accrue only upon the asbestos being disturbed. The court also found unresolved the question of who was responsible for this aspect of abatement. Hence, the court denied dismissal as to this branch of the claim, pending further determination of what impact, if any, the exit work had on in-situ asbestos. As to the dispute whether the tenant's or the landlord's itemization was correct as regards the tenant's exit work obligations, the court granted the tenant partial summary judgment dismissing most aspects of the claim. However, the court denied the tenant summary judgment under this claim, for removal of the tenant's equipment from certain roof setbacks. The court rejected the tenant's claim that the landlord's failure to repair after the tenant vacated the premises amounted to a discharge of the tenant's obligations to repair. The court thus granted the landlord partial summary judgment dismissing the tenant's affirmative defense

of waiver and discharge. The landlord's claims for punitive damages and attorneys' fees were not addressed but nor were they the subject of motions and hence they remain viable claims. Both parties appeal.

For reasons set forth below, we conclude that the landlord's conduct discharged the tenant's obligation regarding the contractual exit work. Hence, we modify to reinstate the tenant's affirmative defense of waiver and discharge, though for reasons different from those of the motion court. In this regard, we grant the tenant summary judgment declaring that the landlord's conduct, basically obstructing the tenant's performance of exit work prior to its vacating the premises, discharged the tenant's duty to perform exit work pursuant to the leases. The motion court, having dismissed many of the landlord's claims regarding exit work on the basis of the language of the lease, nevertheless found the question concerning removal of equipment from two floors' setbacks to be triable. However, in conformity with our present ruling, we need not reach that question and accordingly we also modify to grant the tenant summary judgment dismissing the landlord's claims and defenses in connection with tenant's purported obligation to remove equipment installed by the tenant on the eighth and eighteenth floor setbacks. For reasons also set forth below, we grant the tenant summary judgment dismissing the landlord's claims and defenses based on the tenant's purported obligation to abate the asbestos that might have been disturbed by the tenant's performance of exit work under the leases. But we modify to deny the tenant summary judgment as to the landlord's breach of contract claim regarding the allegedly defective fireproofing and the related common-law indemnity claim. In this latter regard, we reach a different conclusion from the motion court on the time when the breach of contract claim accrued. Under specific provisions of the lease, there is a triable issue whether the tenant had obligations to remove the hybrid fireproofing prior to vacating the premises, so that this breach of contract claim would have accrued in 1994, rather than at the 1984 installation.

As noted in the landlord's brief, there were three sources governing the tenant's restoration obligations, to the extent such existed: specific lease provisions; the consent agreement allowing alterations not authorized under the lease; and the consent agreement provision addressing "special use space."

In relevant part, the lease illustrated several categories of fixtures and equipment installed by the tenant. These provi-

sions stated that if the equipment and fixtures could be removed without causing permanent structural damage, then the tenant could do so. Thus far, removal was permissive rather than mandatory. However, the tenant would be responsible for "repairs" necessitated by the removal. Elsewhere, the lease (¶ 21.06) reinforced the obligation, stating that the tenant was responsible for repairs necessitated by moving property and furniture, or installing or removing equipment or fixtures. At the end of the tenancy, upon the landlord's written request, the tenant was obliged to remove specified items and to restore the affected exterior building walls, lobby and roof to blend in with adjacent areas (¶ 26.07). The 1965 fourth supplementary agreement, in relevant part, addressed the tenant's renovations to connect the first and ground floors. This provision (¶ 14) directed the tenant, at the end of the tenancy, to remove elevators, escalators, and staircases connecting the specified areas and to close all such openings in the ground floor and first floor slabs, unless the Landlord consent in writing to the contrary.

The 1980 consent agreement was executed in a context where the tenant wanted the capacity to make extensive renovations for which the landlord could have withheld consent under the lease. The consent agreement (¶ 2), broadly addressing improvements and alterations by the tenant, provided authorizations to the tenant for a laundry list of more renovations and improvements (not presently needing itemization) in the areas occupied by the bank.

The consent agreement provided that the improvements enured to the benefit of the landlord. As a quid pro quo, though, the landlord extracted the tenant's agreement to affirmatively perform specified restorations, denoted "exit work." Then, upon the expiration of the lease, specified obligations were imposed on the tenant "if requested by Stahl." This latter phrasing introduces the issue of whether and when the landlord gave proper notice, discussed *infra*. Assuming a proper request, though, the tenant was obliged to remove various improvements and to restore the premises. Responsibility for asbestos abatement is also a core factor in the larger dispute, although asbestos is not directly mentioned in the leases or consent agreement. The asbestos issues are two-fold, although the different issues become intertwined as the parties argue their respective obligations from different starting points: (1) abatement of the asbestos condition, especially if it is aggravated by exit work on the premises, and (2) removal of subsequently installed fireproofing, which also might trigger abatement re-

sponsibilities. During the 1960's, fireproofing consisting of asbestos containing material (ACM) was installed by the landlord, as was legally required at the time. During the 1970's, New York City, like other municipal and State entities, changed direction and prohibited the use of ACM in construction as the dangers of asbestos became more apparent. According to the landlord's complaint, the tenant undertook an abatement project starting in 1981, but either failed to complete it or did it improperly. The tenant extensively renovated parts of the premises during the early 1980's. The ACM fireproofing allegedly was not removed during renovations in the 1980's or thereafter, purportedly in violation of the 1985 enactment of Local Law No. 76 of the City of New York, requiring removal or encapsulation of ACM during renovation work. However, the tenant did install new fireproofing during the early 1980's. This was "hybrid" fireproofing, that apparently was sprayed on to structural elements and to existing ACM fireproofing. The problem then arises with modern-day removal of the "hybrid" fireproofing, if such is to be required, in that adhering ACM must also be remediated. In this regard, demolition of some areas or removal of machinery, plumbing or electrical systems that still had asbestos fireproofing entails similar problems. As such, the landlord sees the removal of the hybrid fireproofing, and the abatement of any asbestos condition, even if not directly referenced, as being intertwined with the issue of the contractual exit work for much of which the tenant concededly is responsible. The landlord thus also argues that the tenant's exit work, involving some demolition and removal of machinery, electrical and plumbing, would trigger a release of asbestos, and that abatement of that asbestos condition was the tenant's responsibility under the lease and related agreements. The tenant, just as forcefully, argues that abatement of any asbestos condition always remained with the landlord. Regarding the hybrid fireproofing, the landlord also argues that the very installation of this hybrid fireproofing was defectively done, was illegal and, as such, also constituted a breach of the lease. The landlord asserts that, additionally, the tenant's remedial obligations extended throughout the tenancy until the premises were vacated.

In addition to whether certain exit work was required, there is a dispute whether adequate notice was given by the landlord as to trigger the tenant's obligation. The lease and consent agreement obligated the landlord, upon being advised by the tenant of improvements that the tenant was not intending to

remove as potential exit work, to timely notify the tenant that the landlord would require the removal of specified improvements. The leases were scheduled to expire in July 1994. It is undisputed that the landlord had until February 1994 to notify the tenant of the exit work that the landlord would require. The tenant gave the landlord written notice in March and April 1993 that it did not intend to remove any of its property or improvements other than movable furnishings. However, the various letters also evince that informal discussions addressed various items of exit work.

The documentation between the parties over this period of time was extensive. It commenced with general positions staked out as to the tenant's obligations—which were generally acknowledged by the tenant—and evincing cooperativeness on all sides. Certain Buildings Department forms, requiring the landlord's signature, had to be filed by the tenant before commencing much of the work. These forms addressed asbestos abatement and the impact of the exit work on the building's floor area ration. It is evident that, aside from some disputes over the manner in which some of the proposed exit work would be performed, the landlord refused to cooperate when asbestos abatement work entered the picture. The correspondence eventually became adversarial as the parties grappled with, among other items, the nature and extent of the asbestos abatement work, and who was responsible for it.

By letter dated March 10, 1993, the tenant formally provided notice, and indicated that it would attempt to meet the landlord's apparent request for an earlier termination on several floors so that the premises could be shown to prospective new tenants. The tenant requested a prompt reply. By letter dated March 11, 1993, the tenant advised the landlord that "Chem Court," an atrium in the front of the building, would not be restored insofar as that obligation was not imposed by the lease. Although this item became a disputed issue, we have since found it not to be tenant exit work (*Chemical Bank v Stahl*, 223 AD2d 460). Hence, this issue, although addressed throughout the correspondence, has become academic. By letter dated April 15, 1993, the tenant acknowledged that under the lease, the landlord was not required to respond at the time to the tenant's notice, but suggested that it was to the parties' mutual best interest to promptly sort out the tenant's exit responsibilities. The tenant acknowledged, by specific reference to the consent agreement, that the landlord had the right, on or before February 1, 1994, to request the tenant to perform certain exit work.

By letter dated November 15, 1993, the landlord responded. This letter basically tracked the lease and the consent agreement, but also seemed to expand the tenant's obligations. The landlord, in almost a boilerplate manner, demanded that the tenant remove a lengthy list of improvements and property and attached a schedule of items that was stated to be nonexclusive. The motion court, as noted, found removal or restoration of many of these items not to be required by the lease or consent agreement, excepting the unresolved issue of equipment on setbacks, but as also noted, our holding makes our own findings in that regard unnecessary.

By letter dated December 3, 1993, the tenant, responding, enclosed plans and specifications for the exit work that it proposed. In preparation for its exit work obligations, the tenant hired architects to draw up plans and specifications, retained environmental consultants in anticipation of asbestos abatement as required by the Department of Buildings, and hired another consultant to shepherd the various applications for approvals through the regulatory and administrative processes. The tenant claims that it expended $400,000 just for the consultants. The tenant indicated that Buildings Department applications that were a necessary preliminary to undertaking the work would be sent in a few days, and that the landlord's prompt execution and return was expected. The approval applications were forwarded with a December 10, 1993 letter. The tenant also included asbestos abatement drawings provided by its environmental consultant in connection with the exit work. However, this letter indicated that the landlord was responsible for the abatement work, and that the landlord's licensed asbestos investigator must certify that the premises were asbestos-free as a predicate to completion of the Buildings Department applications. Apparently at some point, the tenant had indicated that it had abated ACM fireproofing, but the record is less than clear as to what this means or the final status of those efforts. In any event, these references to asbestos abatement started a round of correspondence back and forth in which each party tried to impose abatement responsibilities on the other party. The result, contributing in no small part to this litigation, was that the Buildings Department applications, always held hostage to abatement, were not filed and much of the restoration work was not done.

By letter dated December 3, 1993, the landlord had been informed by its own consultants of the extent of the asbestos contamination problem on two floors in particular where, dur-

ing demolition work, ceilings had been removed, revealing ACM that was neither removed nor encapsulated by the tenant. The tenant argued before the motion court that insofar as this ACM was within the ceilings, and the ceilings were not part of the demised premises, the abatement of that ACM was not the tenant's responsibility. The consultant's notice prompted a letter from the landlord to the tenant dated January 3, 1994. This letter advised the tenant that demolition work, including the attempted removal of ACMs during the prior 1984 renovations, had impaired the integrity of the fireproofing in violation of law as well as of the lease. The landlord contended that additional abatement responsibilities accrued to the tenant insofar as certain ACMs were not even removed or encapsulated during the ongoing exit demolition work. As such, the landlord served upon the bank a purported "Default Notice" demanding that "such defaults" be cured immediately.

By a separate letter also dated January 3, 1994, the landlord now rejected the adequacy of the tenant's proposed exit work. Though stating an intent to cooperate so as to mitigate damages, the landlord demanded that the terms of its own November 15, 1993 letter be satisfied. In response to the tenant's December 10, 1993 letter, the landlord contended that asbestos abatement was the tenant's responsibility. The landlord also rejected the adequacy of the tenant's asbestos abatement drawings, but without illustrating why. The landlord stated that it would sign the Buildings Department approval applications only after the tenant, in the landlord's characterization, accurately described the work so as to satisfy the lease and consent agreement and relevant laws and regulations.

By letters dated January 18 and January 27, 1994, the tenant responded. The January 18 letter, referring to lease provisions, again contended that asbestos removal was the landlord's responsibility. Nevertheless, because of the landlord's refusal to perform, the tenant indicated that it had hired a contractor to perform the abatement and that the invoices would be sent to the landlord. The tenant, again conceding its obligation to perform exit work, but contending that the demands in the landlord's November 15 letter were overbroad, stated its goal of performing at least the work the tenant conceded was necessary and allowing the landlord to reserve its rights as to disputed work. This letter also complained that the default notice in various respects was facially defective. This letter repeated the demand that the landlord sign the Buildings

Department approval applications so that at least part of the restoration project could be commenced. The January 27 letter included additional plans and applications for the balance of the exit work. The tenant now demanded that the landlord execute a release indicating that the tenant was not in default.

This prompted the landlord's March 3, 1994 response, declining to sign the asbestos abatement certification forms on the basis that the tenant had failed to provide for yet additional abatement work, and noting that the tenant's original materials had been based on the erroneous assumption that all fireproofing in employee-occupied areas had been free of ACMs. The landlord again demanded that the tenant provide "accurate" asbestos project specifications as a preliminary to the landlord signing the asbestos abatement certifications. This letter now also challenged the plans and specifications regarding demolition work in connection with the removal and asbestos-free disposal of certain mechanical systems, and the effect of removal on asbestos fireproofing. The landlord, though, did not provide any greater specificity as to how the specifications were inadequate, just that they were. The landlord claimed a willingness to promptly sign the necessary documents, but, again, only after the tenant performed as demanded. The tenant's March 7, 1994 response repeated that the landlord's default notice failed to specify particular defaults and was too vague to allow the tenant's response. This letter directly disputed the landlord's contentions regarding the adequacy of the demolition regarding its allowance for asbestos contamination, and reiterated that mechanical equipment removal and disposal would comply with legal requirements. This letter again urged the landlord to sign the necessary documentation allowing exit work to proceed. Now, the tenant stated that the landlord's refusal to do so would be interpreted as the landlord's waiver of the tenant's exit work obligations. This latter statement introduced the waiver issue presently argued on appeal.

More than a month later, by letter dated April 14, 1994, the landlord's attorney provided the signed Buildings Department forms, and made requests regarding monitoring the asbestos abatement work. The letter indicated that the forms were provided under protest and the landlord acted without prejudice to its claims regarding the tenant's restoration obligations under the lease. By now, the parties were apparently in litigation. However, the tenant, by letter dated April 18, 1994, now emphatically stated that the landlord had waived the tenant's

exit work obligation by failing to timely provide the signed forms months before, and that the present submission of the forms did not serve to revive the tenant's obligation. The tenant indicated that the forms had originally been sent in time to allow for six months of exit work, and the time was now compressed to, at most, three months, timed for the July 1994 vacating of the premises. The tenant argued that the landlord's dilatory conduct, compressing the tenant's time within which to perform, had escalated the tenant's expenses. The tenant still evinced a willingness to perform some of the work demanded in the landlord's recent correspondence, but not all. The tenant now also indicated that the landlord had zoning and architectural obligations, not relating to asbestos, arising from the exit work and its impact on the building's floor area ratio. These executed forms also had to be filed with the Buildings Department prior to performance of the exit work, a demand now made by the tenant. The letter also demanded that the landlord withdraw an arbitration demand that apparently had been served on the tenant. By now, Action A had already been commenced. The tenant vacated the premises in July 1994 without performing the exit work. Nor, apparently, has the landlord seen the need to undertake much of the disputed work.

Viewing this correspondence collectively, certain features stand out. It is undisputed that the landlord refused to sign the administrative forms that were necessary to commencement of the tenant's exit work. The landlord's essentially conclusory explanation that it would not execute the forms until the tenant agreed to perform specified exit work, and to amend the tenant's plans and specifications, including the plans for asbestos abatement, is hardly an adequate basis to excuse what manifestly was an obstruction to the tenant's performance of any of its own obligations.

The landlord expressly conditioned its consent to the exit work on the tenant's agreement to perform all exit work demanded by the landlord in correspondence rather than the exit work outlined in the tenant's plans and specifications. The disparity between the different views of the exit work, of course, can be addressed to the terms of the lease and related documents and could have been resolved in a less vexing manner. The landlord's satisfaction of this preliminary task also became conditioned on the tenant's assumption of abatement responsibilities, a matter not directly addressed in the lease, with both parties interpreting general lease provisions as imposing this

general responsibility on the other party. These, of course, are all arguable points, which could have been resolved either by negotiation, arbitration or litigation. But the important fact is that the landlord, by its conduct, effectively prevented the tenant, which always sought to mitigate regarding disputed areas of performance, from getting to square one to at least partially perform its lease obligations until the lease was about to expire. By contrast, there is no record support for the landlord's claim that the tenant was obstructive. Moreover, the landlord's correspondence claiming that the tenant's plans and specifications were inadequate was itself inadequate as a basis for identifying how the tenant was abdicating particular responsibilities.

The issues for appeal fall into five basic groupings: whether the landlord's conduct discharged the tenant's obligation to perform exit work; if the tenant's obligation was not discharged, what was the scope of that work, and was the tenant obligated to abate an asbestos condition caused by the exit work; whether the landlord retains a viable claim that the tenant, by allegedly installing illegal ACM fireproofing in or about 1984, and failing to remove it thereafter, violated the lease's prohibition against violations of law; and whether this latter condition allows the landlord to recoup abatement costs pursuant to common-law indemnity.

The issue of waiver, or discharge, is dispositive of many of the claims. As such, we need not parse which particular items of exit work were contractually mandated.

The landlord argues that it was justified in withholding its execution of administrative forms until such time that the tenant's plans and specifications were adequate for completion of the exit work. In the appellate brief, the landlord concedes that it would not have permitted even the limited restoration work that was undisputed until such time as the tenant provided assurances regarding the asbestos abatement.

As a general matter, to the extent that the landlord's refusal was unjustified, the landlord would have breached an implied covenant not to prevent and to reasonably cooperate with the tenant's performance of its lease obligations as well as the implied covenant of good faith and fair dealing (Restatement [Second] of Contracts § 205). It has been long established that in "every contract there is an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part" (*Patterson v Meyerhofer*, 204 NY 96, 100), a concept "rooted in notions of common sense and fair-

ness" (*Wieder v Skala*, 80 NY2d 628, 637, referencing Farnsworth, Contracts § 7.16, at 524 [1982]). Conduct affirmatively preventing the other party from performing would materially breach the lease. The need for the landlord's cooperation in this regard can also be viewed as a constructive condition to the tenant's own duty to perform exit work. The landlord's obstructive conduct, then, would excuse the tenant's performance of its lease obligation, and a continuing refusal by the landlord would ultimately discharge the tenant's obligation (*see generally*, Restatement [Second] of Contracts §§ 225 ["Effects of the Non-Occurrence of a Condition"], 226 ["How an Event May Be Made a Condition"], and comment *c* thereto, and 237 ["Effect on Other Party's Duties of a Failure to Render Performance"], and comments *a* and *b* thereto). As such, in the present case, the discharge issue turns on whether the record supports the landlord's conclusory claim that it was justified in basically withholding consent to the tenant's exit work during the time period when consent was necessary.

Under these circumstances, as evidenced by the extensive correspondence, the landlord's conduct was unjustified. This conclusion addresses disputes regarding the general exit work as well as the asbestos abatement relating to the exit work. First, the default notice upon which the tenant was supposed to rely to cure the putative default was a facially insufficient basis upon which to direct the tenant toward its shortcomings, and an insufficient reason for the landlord to withhold consent. Moreover, the landlord construes the asbestos abatement work, apparently an afterthought, to be integrally connected with the remainder of the exit work, but that conclusion is not supported by the record. Rather, the landlord still could have reserved its rights—and in fact was invited to do so by the tenant—as to the abatement, and as to disputed exit work, while at the same time allowing at least part of the restoration work to go forward. As to the preliminary need to address abatement, the landlord could have timely provided for abatement, or assessment of the need for it, at its own expense and sought recovery from the tenant in the event that the asbestos work was the tenant's responsibility. Considering the sophistication of these parties, and the overall scope of the exit work required, to unilaterally hold up the tenant's performance of the significant portion of the work that was undisputed in order to force the tenant to alter its legal position regarding the asbestos abatement work was unjustified.

This conclusion is further borne out when one analyzes where responsibility for the asbestos abatement is reposed by the

lease. This analysis turns on two different responsibilities: the tenant's responsibility to "repair," and its responsibility to comply with the law. New York City Local Law No. 76, enacted in 1985, requires abatement or encapsulation of asbestos that may be disturbed during building renovations. In evaluating the respective responsibilities of the parties under leases for this supervening change in law, with regard to pre-existing asbestos conditions in commercial buildings, such a responsibility is generally construed to be structural and extraordinary (*Wolf v 2539 Realty Assocs.*, 161 AD2d 11; *Linden Blvd. v Elota Realty Co.*, 196 AD2d 808, *lv denied* 82 NY2d 658). The asbestos that was originally installed by the landlord preceded the enactment of Local Law No. 76. Not surprisingly, the original lease, also preceding the legislation, is silent. The issue was not identified in subsequent leases and supplementary documents. We have previously held that absent a lease covenant to the contrary, responsibility for Local Law No. 76 compliance is not shifted from the landlord to the tenant (*Marine Midland Bank v 140 Broadway Co.*, 236 AD2d 232; *see*, *Wolf v 2539 Realty Assocs.*, *supra*; *see also*, *Bush Term. Assocs. v Federated Dept. Stores*, 73 AD2d 943; *see generally*, 2 Friedman, Leases § 11.1, at 755 [4th ed 1997]; 2 Dolan, Rasch's Landlord and Tenant—Summary Proceedings § 19:26, at 97 [4th ed 1998]). Since the lease, even as supplemented, does not expressly shift this particular financial burden to the tenant, even in the context that the tenant's exit work might cause or exacerbate an asbestos condition, the burden as between the parties does not rest on the tenant.

The landlord relies on lease provisions (¶¶ 20.02, 20.03, 21.01, 34.02) that impose on the tenant the responsibility to "repair" "damages" caused by the tenant's removal activities. But as Justice Rubin of our Court has framed the issue, "the abatement of [an] asbestos hazard is not a condition in need of 'repair' in the normal sense of the word * * *. Corrective measures are not necessitated by any damage or wear which impairs the effectiveness of the material. Significantly, there is no allegation that the ACM applied to the structural steel has been rendered ineffective for its intended function as a fireproofing agent. Rather, remedial measures are mandated by a supervening change in governmental policy which reflects an awareness that asbestos—at least in readily friable form—is unsuitable for use in areas of human occupancy. Such mandated alterations do not come within the purview of the repair clause [of the lease]" (*Wolf v 2539 Realty Assocs.*, *supra*, at 15).

Lease paragraph 16.01 and paragraph 6 of the consent agreement impose on the tenant the obligation to comply with legal requirements at its own expense. It must be borne in mind, though, that responsibility being passed back and forth in this case arises in connection with "an inherent characteristic of a material employed in the original construction of the premises by the owner * * * in compliance with then-existing laws and regulations" (*Wolf v 2539 Realty Assocs., supra,* at 16). Although the dispute in *Wolf* differed somewhat from the present dispute, in that compliance had to do with ongoing occupancy by the tenant rather than the tenant's anticipated termination of occupancy, *Wolf*'s general point remains valid for our review of the present lease. paragraph 16.01 illustrates the tenant's compliance obligation in terms of particular uses of the premises by the tenant. The exit work is not one of those categories of use nor, logically, would it be, so that paragraph 16.01 does not speak to compliance as part of the exit work. The exit work was not for the tenant's use and enjoyment of the premises (*cf., Marine Midland Bank v 140 Broadway Co., supra*), but rather was the tenant's obligation to the landlord under the lease to restore the premises to its original condition. The performance of that obligation does not implicitly create the additional obligation posed by the landlord, one that is not specified in the lease and does not arise from the tenant's use and enjoyment of the premises. As in *Marine Midland Bank (supra)*, this conclusion is particularly compelled in that the corrective action arises only from a subsequent regulation not contemplated by the parties when entering the lease. In sum, the landlord cannot unilaterally impose the presumably significant cost of asbestos abatement on the tenant. Finally, even viewed equitably, insofar as asbestos abatement provides an economic benefit enuring to the landlord, rather than to the vacating tenant, there is no sound basis to construe the lease in a manner to shift this cost to the tenant (*Marine Midland Bank v 140 Broadway Co., supra; Linden Blvd. v Elota Realty Co., supra*).

Accordingly, we modify to grant summary judgment to the tenant and deny summary judgment to the landlord, declaring that the landlord's conduct discharged the tenant's obligation to perform exit work required in the lease and supplemental documents. Moreover, we also modify to grant the tenant summary judgment dismissing the landlord's claims regarding asbestos abatement work potentially required as a consequence of the exit work.

However, as to the landlord's breach of contract claim arising out of the tenant's 1984 installation of fireproofing dismissed by the motion court, we modify to deny the tenant summary judgment and to reinstate that claim. As noted above, the motion court construed the six-year Statute of Limitations to accrue when the fireproofing was installed, some 10 years prior to commencement of the action. However, the operative lease provision in this regard is article 34, addressing surrender of the premises. That article requires the tenant "on the last day of the term of this lease" to "quit and surrender the demised premises to Landlord in good order, condition and repair, except for ordinary wear and tear." Whether or not the failure to remove, upon or prior to surrender, the fireproofing it installed was a breach of this provision remains an unresolved issue; however, for Statute of Limitations purposes, the claim logically accrues upon the 1994 surrender. The breach of contract claim also refers to the tenant's installation of the hybrid fireproofing, allegedly in an illegal manner. The lease required the tenant, during occupancy, to "comply with all laws and requirements of public authorities" (¶¶ 9.03 and 16.01), by its terms also an ongoing obligation. This result comports with the reality that illegal installation of fireproofing that, by design, is concealed from view, would reasonably be ascertainable only upon surrender and would constitute an ongoing illegality. Hence, the better approach under these circumstances is to construe this issue in terms of the tenant's obligation to return the premises to the landlord in a good and lawful condition. Since an action for breach of a covenant to keep the premises in good repair "may be brought either before or after the expiration of the term" of the lease (*City of New York v Pennsylvania R. R. Co.*, 37 NY2d 298, 301), here, too, the claims were timely brought. The substance of the claim, though, whether or not the fireproofing installed by the tenant was a continuing illegality, requires trial. Parenthetically, the illegality of the fireproofing appears never to have been established, and the landlord appears to have kept it in place since retaking possession of the premises. However, these matters are best addressed in the context of further factfinding.

The court dismissed the indemnification claim as simply advancing a time-barred breach of contract claim with different labeling. Since we reinstate the breach of contract claim, though, that basis for dismissal no longer applies (*cf., MRI Broadway Rental v United States Min. Prods. Co.*, 242 AD2d 440, *affd* 92 NY2d 421 [property damage tort claim arising out

of spraying of asbestos fireproofing; time barred since injury accrued when the injury occurred and owner knew of it; equitable relief unavailable as a mere substitute for invalid legal remedy]). Indemnification is an equitable remedy reflecting that "[i]t is nothing short of simple fairness to recognize that '[a] person who * * * has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity'" (*McDermott v City of New York*, 50 NY2d 211, 217, quoting Restatement of Restitution § 76). "The gravamen of an action for indemnity is that both parties * * * are subject to a duty to a third person under such circumstances that one of them, as between themselves, should perform it rather than the other" (*City of New York v Lead Indus. Assn.*, 222 AD2d 119, 125). That, actually, is the thrust of the claim, which accrues upon the landlord's own expenditure of costs, and which we reinstate.

Accordingly, the order of the Supreme Court, New York County (Charles Ramos, J.), entered March 4, 1999, which granted in part and denied in part each of the respective motions of the bank and landlord for partial summary judgment in the two consolidated actions, should be modified, on the law, to grant the tenant summary judgment declaring that the landlord's conduct discharged the tenant's duty to perform exit work under the lease and supplemental documents; to deny the landlord summary judgment dismissing the tenant's affirmative defense of waiver and discharge; to grant the tenant summary judgment dismissing the landlord's claims and defenses in connection with the tenant's purported asbestos abatement work arising from performance of the exit work; to grant the tenant summary judgment dismissing the landlord's claims and defenses in connection with removal of certain equipment from roof setbacks from the eighth to the eighteenth floors; to deny the tenant summary judgment dismissing the landlord's breach of contract cause of action arising from the tenant's alleged installation of defective fireproofing and reinstating that cause of action; and to deny the tenant summary judgment dismissing the landlord's common-law indemnity cause of action also based on the tenant's alleged installation of defective fireproofing and also reinstating that claim; and otherwise affirmed, without costs.

WILLIAMS, J. P., SAXE, BUCKLEY and FRIEDMAN, JJ., concur.

Order, Supreme Court, New York County, entered March 4, 1999, modified, on the law, to grant the tenant summary judg-

ment declaring that the landlord's conduct discharged the tenant's duty to perform exit work under the lease and supplemental documents; to deny the landlord summary judgment dismissing the tenant's affirmative defense of waiver and discharge; to grant the tenant summary judgment dismissing the landlord's claims and defenses in connection with the tenant's purported asbestos abatement work arising from performance of the exit work; to grant the tenant summary judgment dismissing the landlord's claims and defenses in connection with removal of certain equipment from roof setbacks from the eighth to the eighteenth floors; to deny the tenant summary judgment dismissing the landlord's breach of contract cause of action arising from the tenant's alleged installation of defective fireproofing and reinstating that cause of action; and to deny the tenant summary judgment dismissing the landlord's common-law indemnity cause of action also based on the tenant's alleged installation of defective fireproofing and also reinstating that claim; and otherwise affirmed, without costs.