[37 NYS3d 72]

Rebecca Broadway Limited Partnership et al., Respondents,
v Mark Christopher Hotton et al., Defendants, and Marc
Thibodeau, Appellant.

First Department, August 18, 2016

## APPEARANCES OF COUNSEL

*Nesenoff & Miltenberg, LLP*, New York City (*Philip A. Byler* and *Andrew T. Miltenberg* of counsel), for appellant.

*Schlam Stone & Dolan LLP*, New York City (*Erik S. Groothuis, Jonathan Mazer* and *Richard H. Dolan* of counsel), for respondents.

## OPINION OF THE COURT

FRIEDMAN, J.P.

This case arises from an unsuccessful effort to produce a Broadway musical about a ghost. After it was reported that a major foreign investor in the production had died, it emerged that the supposedly deceased backer had never been more than a ghost himself—the man had never existed, except as a deceptive construct conjured up by a dishonest fundraiser, who has since been incarcerated for this wrongdoing. The publicity agent for the show, when he began to suspect the truth about the supposedly deceased foreign investor, expressed his concerns to the producer's principal, who essentially told him to keep quiet about it. Apparently stung by this dismissive treatment, the publicity agent sent four anonymous emails to another potential investor (this one an actual, living person), who had wished to remain anonymous. The last of these emails, sent under a fictitious name, made various highly negative allegations about the producer and the show's prospects, and urged the potential investor not to back the play. After receiving this email, the potential investor promptly withdrew from involvement in the production, preventing it from going forward.

At issue on this appeal are the producer's claims against the publicity agent for defamation, tortious interference with prospective business relations and breach of contract, based on the agent's emails to the potential ".angel investor" (as the producer refers to him). Although neither the producer nor the publicity agent can be credited with angelic virtue, we hold that Supreme Court correctly determined that the producer's claims for defamation and tortious interference should go to trial. Supreme Court also correctly determined that the record establishes that the producer is entitled to summary judgment as to liability on its claim for breach of contract against the publicity agent. The surreptitious and anonymous emails that the agent sent to the prospective investor—whose identity had been the producer's confidential information—apparently were intended to sink the project, and accomplished that goal. The publicity agent thus "destroy[ed] or injur[ed] the right of [the producer] to receive the fruits of [its] contract [with the agent]" (*511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144, 153 [2002] [internal quotation marks omitted]). That contract had been intended to facilitate the very theatrical production that the agent sabotaged by means of his emails, which he had only been able to send by misusing the producer's confidential information. This is the very definition of a breach of the covenant of good faith and fair dealing that the law of New York implies in every contract (*see* Restatement [Second] of Contracts § 205, Comment *a* ["Good faith performance . . . of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party"]). Accordingly, on this record, the publicity agent's liability to the producer for breach of contract is established as a matter of law.

Plaintiff Rebecca Broadway Limited Partnership (RBLP) was formed in 2011 to stage a Broadway production of "Rebecca—The Musical," a musical play based on Rebecca, the famous 1938 gothic novel by Daphne du Maurier.[1] By a written agreement dated May 10, 2012, RBLP hired defendant Marc Thibodeau "as the Press Representative for the Play to provide public relations services as may customarily be required by [RBLP] to be rendered by the press representative of a first-class musical stage play production."

---

1. The general partner of RBLP is plaintiff Sprecher/Forlenza Productions Inc. This writing hereinafter refers to both plaintiffs collectively as RBLP.

Earlier in 2012, RBLP had hired defendant Mark Hotton—who is not a party to this appeal—to assist in raising capital for the production. Hotton, after traveling abroad at RBLP's expense, returned with purported funding commitments from a group of four foreign investors who collectively subscribed to provide $4.5 million of capital, more than a third of the $12 million that was needed. The alleged leader of this investor group was a man identified as Paul Abrams, who was said to have committed to provide personally $2 million of the $4.5 million to be forthcoming from the group.

In September 2012, RBLP was informed that Paul Abrams had suddenly died in London after contracting malaria while on a trip to Africa. RBLP shared this information with Thibodeau, who issued a press release on RBLP's behalf, dated September 8, 2012, announcing that the start of rehearsals for the show was being "delayed . . . by two weeks [from September 10 to September 24] due to the death of a key investor responsible for a $4.5 million investment pool in the production." RBLP also subsequently informed Thibodeau that it was engaged in discussions with Laurence Runsdorf, a new prospective investor who might replace a significant portion of the funds that Abrams had been expected to provide. RBLP also informed Thibodeau that Runsdorf wished to keep his involvement in the production confidential.

After the announcement of the demise of the foreign investor, Thibodeau spoke with Patrick Healy, a New York Times reporter who was investigating the matter. From his discussions with Healy and research he conducted on his own, Thibodeau began to suspect that Abrams, a figure previously unknown on the Broadway scene, was a fictitious character. Thibodeau was unable to locate any obituary for a person named Paul Abrams corresponding to the description provided by Hotton, nor any other information verifying the existence of such a person. Thibodeau further discovered through an Internet search that several lawsuits for fraud were pending against Hotton. On September 21 and 24, 2012, Thibodeau discussed with Ben Sprecher, one of RBLP's two principals, his suspicions concerning the foreign investors supposedly located by Hotton. Sprecher responded by instructing Thibodeau not to discuss the matter with anyone (as recalled by Thibodeau, Sprecher said "don't go there about this stuff") and further telling Thibodeau that "we are not going to talk about this anymore."

On September 25 and 26, 2012, while RBLP's negotiations with Runsdorf were ongoing, articles appeared in the New York Times and the New York Post, respectively, suggesting that Abrams had never existed. It is undisputed that, on September 25, 26, and 28, Thibodeau sent four anonymous emails to Runsdorf or his representatives. The first three emails merely drew attention to the Times and Post articles, but the fourth email, dated September 28, 2012, which Thibodeau sent under the false name "Sarah Finkelstein" to Runsdorf himself, made a number of damaging and (according to RBLP) false allegations, including: (1) that the "walls are about to cave in on Mr[.] Sprecher [RBLP's principal] and the Rebecca Broadway production"; (2) that the "cloud hanging over this production is very very dark"; (3) that "[e]ven before any of this happened, Rebecca's prospects were not very promising and every major regular Broadway investor has passed on [it]"; and (4) that "with this prospect of fraud, an ongoing money shortage, a bad public perception, anemic ticket sales, and a rabid press corps, the only good reason to invest in [R]ebecca would be for a tax write-off and a desire to be dragged into a fraud trial."

Promptly after receiving the September 28 email, Runsdorf—who, as previously noted, had not wanted his involvement with the play to become publicly known—told RBLP that he was no longer interested in backing "Rebecca—The Musical." RBLP was forced to cancel the first rehearsal for the show, which had been scheduled for the next week. "Rebecca—The Musical" has not opened on Broadway to date.

After Runsdorf's withdrawal, it emerged that Hotton, the fundraiser, had indeed created the fictitious investor Paul Abrams and his three associates and perpetrated other frauds upon RBLP in connection with the "Rebecca—The Musical" project. Hotton ultimately pleaded guilty to federal charges of wire fraud based on this scheme, and was sentenced to nearly three years in prison. So far as the record discloses, RBLP and its principals have not been accused of any wrongdoing in this matter.

In this action, as relevant to this appeal, RBLP asserts causes of action for breach of contract, tortious interference with business relations and defamation against Thibodeau. Thibodeau brings the instant appeal from Supreme Court's order granting RBLP's motion for summary judgment as to liability on its cause of action for breach of contract and denying

Thibodeau's cross motion for summary judgment dismissing RBLP's causes of actions for tortious interference with business relations and defamation. We affirm.

■ Initially, we hold that Supreme Court correctly denied Thibodeau's cross motion for summary judgment dismissing the defamation and tortious interference claims. With respect to the defamation cause of action, even if RBLP constituted a limited-purpose public figure in connection with matters relating to the attempted production of "Rebecca—The Musical" (*see Perez v Violence Intervention Program*, 116 AD3d 601, 601-602 [1st Dept 2014], *lv denied* 25 NY3d 915 [2015]), and would therefore be required to prove "actual malice" within the meaning of *New York Times Co. v Sullivan* (376 US 254 [1964])—the highest potentially applicable standard of proof on a defamation claim—to prevail at trial, a jury could find that there is clear and convincing evidence that Thibodeau wrote the September 28 email either with knowledge of the falsity of statements made in that email or with reckless disregard for the truth or falsity of such statements (*see New York Times Co. v Sullivan*, 376 US at 279-280; *Kipper v NYP Holdings Co., Inc.*, 12 NY3d 348, 357 [2009]).[2]

■ Similarly, the court properly found that issues of fact precluded summary judgment dismissing the claim for tortious interference with prospective business relations, inasmuch as the record contains evidence to support a finding that Thibodeau caused the loss of the play's financing, either through the use of wrongful means (specifically, the use of Runsdorf's identity, which was RBLP's confidential information, to send the email) or with the sole purpose of inflicting harm on RBLP (*see e.g. CBS Corp. v Dumsday*, 268 AD2d 350, 352-353 [1st Dept 2000]). The truth of Thibodeau's claim that he was acting in the interest of investors, rather than with the sole purpose of harming RBLP, is a contested issue to be determined by the factfinder at trial.

■ As to the breach of contract cause of action, Supreme Court properly granted RBLP summary judgment as to liability

---

2. In denying Thibodeau's motion for summary judgment dismissing the defamation cause of action, Supreme Court found it unnecessary to determine which standard of proof applied because there was sufficient evidence in the record to sustain the claim under any potential standard. Thibodeau, the only party appealing, has not requested that we determine the applicable standard of proof in the event we affirm the denial of summary judgment dismissing the defamation claim.

on that claim. The record establishes that Thibodeau, without RBLP's authorization, and using confidential information he had obtained as a result of his employment as RBLP's press representative, sent an email directly to Runsdorf, a key potential investor who had desired to remain anonymous, causing Runsdorf to withdraw his financial commitment, all of which resulted in the cancellation of rehearsals and the play's failure to open. Even assuming that his conduct did not violate the express terms of his agreement to act as the play's press representative, Thibodeau breached the implied duty of good faith and fair dealing by essentially defeating the purpose of the agreement by his actions (see *511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d at 153). Thibodeau was hired by RBLP to use his public relations skills to facilitate the production of a play; his actions, in which he made use of confidential information that RBLP had entrusted to him in the course of his employment, made it impossible for RBLP to produce the play as planned. It is difficult to imagine a plainer case of a party to a contract utterly defeating the purpose for which the other party had entered into that contract, or a more blatant example of an agent's disloyalty to his principal.[3]

■ Thibodeau argues that RBLP should not have been granted summary judgment as to liability on the breach of contract claim because an issue of fact exists as to whether his sending of the emails, even if that would otherwise constitute a breach, might have been excused by a prior breach of the implied duty of good faith and fair dealing by RBLP itself. On this record, Thibodeau's contention is, as Supreme Court aptly put it, "a nonstarter," and without merit as a matter of law. There is nothing in the record to support Thibodeau's contention that RBLP undermined his ability to perform his duties under the contract honestly or his contention that RBLP required him to engage in conduct that would implicate him in

---

**3.** Thibodeau also argues that RBLP was not harmed by his actions because, even if Runsdorf had decided to invest, RBLP likely would not have located sufficient funding to proceed with the production. On a cause of action for breach of contract, this argument goes to the question of damages, not liability (see *Kronos, Inc. v AVX Corp.*, 81 NY2d 90, 95 [1993]; *Ross v Sherman*, 95 AD3d 1100 [2d Dept 2012]; Restatement [Second] of Contracts § 346; 24 Richard A. Lord, Williston on Contracts § 64:6 at 62 [4th ed 2002] ["An action will . . . lie for the breach (of a contract) although it causes no injury"]). In any event, the record contains evidence supporting RBLP's contention that, if Runsdorf had gone through with his contemplated investment of $2.25 million, RBLP's principals would have provided out of their personal assets the remaining capital required to launch the play.

Hotton's fraud when it ultimately came to light. On the contrary, as Supreme Court observed in its decision, RBLP never instructed Thibodeau to issue a press release containing a statement that he believed to be false (or even any statement as to which he had doubts), nor is there any evidence that RBLP ever instructed Thibodeau to respond falsely to inquiries from the press. By Thibodeau's own account, Sprecher, the RBLP principal, simply instructed him to keep silent about the Abrams issue, not to lie about it. Neither does Thibodeau claim that RBLP ever lied to him. In short, there is nothing in the record to support Thibodeau's claim that RBLP was causing him to implicate himself, wittingly or unwittingly, in any fraud or scandal.[4]

Thibodeau does claim that, on September 21 and 24, 2012, Sprecher responded dismissively to Thibodeau's expressions of concern that Abrams might be fictitious. In those exchanges, as previously described, Sprecher essentially instructed Thibodeau to keep quiet about the Abrams matter, both in dealing with the public and internally. However, RBLP, as Thibodeau's principal, had no obligation to be more forthcoming in discussing the financing issue with him, or to treat his concerns more respectfully than it did. In this regard, it should be borne in mind that, as Supreme Court emphasized in its decision, Thibodeau had no responsibility whatsoever for the financing of the project or for dealing with the project's investors. His role was simply to prepare and issue press releases and to deal with reporters. If RBLP did not wish Thibodeau to address financing issues in these communications, that was its prerogative as the principal in this principal-agent relationship. Nothing that RBLP did, or is alleged to have done, interfered with Thibodeau's ability to perform honestly the limited task charged to him.

In support of his position that RBLP breached the covenant of good faith and fair dealing, Thibodeau points to deposition

---

4. As previously noted, on September 8, 2012, Thibodeau did issue, at RBLP's direction, a press release announcing that rehearsals were being delayed "due to the death of a key investor," but there is no evidence in the record to support a finding that either RBLP or Thibodeau had reason to believe that Abrams was fictitious as of that date. Thibodeau's doubts about Abrams arose from discussions he had with the New York Times reporter, and research he conducted, after September 8. While Sprecher told the Times that he had flown to London in a failed attempt to meet with a representative of the Abrams estate, and later admitted that he never made such a trip, that misrepresentation was neither made to Thibodeau nor embodied in any press release that Thibodeau issued.

testimony by RBLP's general manager that, during the same period in which Sprecher had instructed him not to "go there about this stuff [i.e., the issue of the foreign investors]," Thibodeau was required to "field[ ]" questions about that very matter. Although Thibodeau might well have felt uncomfortable in meeting the press while under orders not to give them the information they sought, RBLP did not breach the covenant of good faith and fair dealing by giving him those instructions.[5] Again, while the record establishes that RBLP—as was its right—directed Thibodeau not to respond substantively to questions concerning the Abrams issue, Thibodeau does not allege that RBLP ever directed him to respond falsely to press inquiries.[6] He could have responded to questions about Abrams, both truthfully and consistent with RBLP's directives, by stating that RBLP was investigating the matter. RBLP, as Thibodeau's principal, was entitled to limit the subjects that Thibodeau, as RBLP's agent, was authorized to discuss substantively with the press and public; if Thibodeau was uncomfortable with that limitation on his authority, he was free to resign.

Even if RBLP could be deemed to have somehow breached its implied duty to Thibodeau of good faith and fair dealing before he committed his own breach of that covenant by sending the anonymous emails, we would not reach a different result. Any such material breach by RBLP, before the breach by Thibodeau, would have given Thibodeau grounds to suspend his own performance and, absent a timely cure by RBLP of its breach, to terminate his contract with RBLP (and then, perhaps, to seek damages for breach) (*see Chemical Bank v Stahl*, 272 AD2d 1, 15 [1st Dept 2000]; Restatement [Second] of Contracts § 237 and Comments *a* and *b* thereto; 2 Farnsworth, Contracts § 8.15 [3d ed 2004]). But a first material breach of the parties' agreement by RBLP, if there was one, would not have justified Thibodeau's remaining in RBLP's employ while using confidential information entrusted to him to sabotage the production. A party to a bilateral contract, when faced with a breach by the other party, must make an election between declaring a breach and terminating the contract or, alternatively, ignoring the breach and continuing

---

**5.** Needless to say, dealing with pressure from the press and the public is what publicists are paid to do.

**6.** As RBLP's general manager testified, Thibodeau was expected, "not [to] be dishonest," but to put the production "in the best light possible, all things considered."

to perform under the contract. Such a party has no right to represent himself as continuing to perform under the contract—and continuing to receive the other party's performance in exchange—while at the same time surreptitiously breaching his own duty by flouting his own implied duty of good faith and fair dealing (*see Computer Possibilities Unlimited v Mobil Oil Corp.*, 301 AD2d 70, 80 [1st Dept 2002], *lv denied* 100 NY2d 504 [2003] [if a party to a contract, in response to the other party's repudiation of the contract, chooses to "affirm the contract, . . . the nonrepudiating party is deemed to remain obligated to perform under the contract"]; *Inter-Power of N.Y. v Niagara Mohawk Power Corp.*, 259 AD2d 932, 934 [3d Dept 1999], *lv denied* 93 NY2d 812 [1999] [when an executory contract is breached, the injured party "must . . . make an election (between terminating and affirming the contract) and cannot at the same time treat the contract as broken and as subsisting," for "(o)ne course of action excludes the other" (internal quotation marks omitted)]; Restatement [Second] of Contracts § 246 [1] and Comment *b* thereto; 23 Richard A. Lord, Williston on Contracts § 63:33 at 561-562 ["the victim of the breach may either treat the contract as totally breached and stop its own performance or continue to perform and seek damages for the breach; but it may not stop performance and yet continue to take advantage of the benefits of the contract"]).

In this case, Thibodeau, a sophisticated professional with many years of experience as a publicity agent for major Broadway productions, should have suspended his performance or terminated his agreement with RBLP if he sincerely believed that RBLP's conduct would implicate him in a scandal. Alternatively, if RBLP had instructed Thibodeau to issue a materially false press release or to respond falsely to press inquiries (and there is no evidence that it ever did so), Thibodeau would have had a right to refuse such a directive. He did not, however, have the right to continue as RBLP's publicist while sending a prospective provider of needed capital an anonymous communication deprecating the entire production and suggesting that the producers were guilty parties in a fraudulent scheme. Accordingly, as Supreme Court correctly held, RBLP is entitled to judgment as to liability on its cause of action against Thibodeau for breach of contract.

Accordingly, the order of the Supreme Court, New York County (Jeffrey K. Oing, J.), entered on or about May 28, 2015, which granted plaintiffs' motion for summary judgment as to

liability on their cause of action for breach of contract against defendant Thibodeau, and denied Thibodeau's cross motion for summary judgment dismissing plaintiffs' causes of action for tortious interference with prospective business relations and defamation as against him, should be affirmed, with costs.

ACOSTA, RENWICK, SAXE and KAPNICK, JJ., concur.

Order, Supreme Court, New York County, entered on or about May 28, 2015, affirmed, with costs.