08-5250-cv
Lynch v. The City of New York

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term 2009

(Argued November 18, 2009                          Decided December 11, 2009)

Docket No. 08-5250-cv

PATRICK J. LYNCH, as President of the Patrolmen's Benevolent Association of the City of New York, Inc., PATROLMEN'S BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.

*Plaintiffs-Appellants*,

v.

THE CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT, POLICE COMMISSIONER RAYMOND W. KELLY, of the New York City Police Department,

*Defendants-Appellees*.

Before KEARSE, CABRANES, and STRAUB, *Circuit Judges*.

Appeal from a September 30, 2008 order of the United States District Court for the Southern District of New York (George B. Daniels, *Judge*) denying plaintiffs' motion for a preliminary injunction. Plaintiffs, who are union representatives of police officers employed by the New York City Police Department ("NYPD"), challenge the constitutionality of an NYPD policy that requires that a breathalyzer test be administered to every NYPD officer who causes injury or death as a result of firing his or her gun.

We hold as follows: (1) the District Court did not make a "clearly erroneous assessment of the evidence" when it found that the primary purpose of the breathalyzer policy was not the NYPD's "general interest in crime control" and thus fell under the "special needs" doctrine of our Fourth Amendment jurisprudence; (2) the fact that crime control was *one* purpose—but not the

1

*primary* purpose—of the breathalyzer policy does not bar the application of the "special needs" doctrine to the breathalyzer policy; and (3) based on the record at this stage of the proceedings, the breathalyzer policy is reasonable under the three-factor balancing test of the "special needs" doctrine. We conclude, therefore, that the District Court's denial of plaintiffs' motion for a preliminary injunction was not an abuse of discretion.

Affirmed.

> THOMAS P. PUCCIO (Michael T. Murray, *on the brief*), New York, NY, *for plaintiffs-appellants*.
>
> JANE L. GORDON (Michael A. Cardozo, Corporation Counsel of the City of New York, and Edward F.X. Hart and Alan M. Schlesinger, of Counsel, *on the brief*), New York, NY, *for defendants-appellees*.

JOSÉ A. CABRANES, *Circuit Judge*:

Plaintiffs-appellants are union representatives of police officers employed by the New York City Police Department ("NYPD" or "Department"). They brought this action in the United States District Court for the Southern District of New York (George B. Daniels, *Judge*) challenging the constitutionality of an NYPD policy that requires that a breathalyzer test—which measures the amount of alcohol in the bloodstream—be administered to an NYPD officer immediately after he or she causes injury or death as a result of firing his or her gun. Plaintiffs moved in the District Court to preliminarily enjoin the enforcement of the breathalyzer policy, and the District Court denied the motion. Plaintiffs now appeal the denial of the preliminary injunction. We affirm.

## BACKGROUND

In November 2006, undercover NYPD officers in Queens, New York, shot and killed a man named Sean Bell, prompting intense and widespread criticism from the public. In the wake of the Bell shooting, the Commissioner of the NYPD appointed a committee to review the Department's

undercover operations and to make recommendations for improvements. The committee was chaired by Chief Charles V. Campisi ("Campisi"), the head of the Internal Affairs Bureau of the NYPD, which is charged with investigating police misconduct.

The committee recommended, among other things, that a breathalyzer test be administered to any officer who fires his or her weapon and causes death or injury. The Police Commissioner accepted this suggestion and, in September 2007, promulgated Interim Order 52, which established the breathalyzer policy at issue in this action.

The breathalyzer policy applies when any NYPD officer "on or off duty, is involved in a firearms discharge within New York City which results in injury to or death of a person." J.A. 50 (Interim Order 52). The policy first requires that senior NYPD officials be notified of a shooting, including officials from the Internal Affairs Bureau. The policy then requires that a "portable breathalyzer test" be administered "in a private setting" to the "uniformed member(s) of the service who discharged a firearm." *Id.* at 51. If the portable breathalyzer test yields a reading of blood-alcohol level of 0.08 or greater—the legal limit for driving an automobile in New York State—the officer in question must be transported to an Internal Affairs Bureau testing facility where he or she will be given a second test on a more accurate "Intoxilyzer" machine. *Id.*

Plaintiffs brought this action against the City of New York, the NYPD, and Police Commissioner Raymond W. Kelly (collectively, "defendants"), claiming that the breathalyzer policy violates the Fourth Amendment to the United States Constitution. Plaintiffs moved to preliminarily enjoin the enforcement of the breathalyzer policy, and the District Court denied the motion. Plaintiffs could not, the District Court concluded, demonstrate a likelihood of success on the merits because the breathalyzer policy withstood Fourth Amendment scrutiny under the so-called "special

3

needs" doctrine. *See Palladino v. City of N.Y.*, No. 07 Civ. 9246, 2008 WL 4539503 (S.D.N.Y. Sept. 30, 2008).

Plaintiffs brought this timely interlocutory appeal challenging the District Court's denial of the motion for a preliminary injunction.[1] *See* 28 U.S.C. § 1292(a) ("[T]he courts of appeals shall have jurisdiction of appeals from . . . [i]nterlocutory orders of the district courts . . . refusing . . . injunctions.").

## DISCUSSION

On appeal, plaintiffs argue that the District Court erred in evaluating plaintiffs' motion for a preliminary injunction under a "likelihood-of-success" standard, rather than the less rigorous "fair-ground-for-litigation" standard. Plaintiffs also argue that the District Court abused its discretion in denying the preliminary injunction because, in plaintiffs' view, the breathalyzer program is not reasonable under the "special needs" doctrine.

### I.     The District Court Correctly Applied the Likelihood-of-Success Standard

We have recognized two separate standards for whether a district court may grant a preliminary injunction:

> In general, the district court may grant a preliminary injunction if the moving party establishes (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.

---

[1] In addition, defendants moved to dismiss the complaint—or, alternatively, for summary judgment—under Federal Rule of Civil Procedure 12(b)(6), and the District Court denied defendants' motions in the same ruling in which it denied plaintiffs' motion for a preliminary injunction. We do not have jurisdiction to review the denial of defendants' motions on this interlocutory appeal. *See* 28 U.S.C. § 1291 (providing that the courts of appeals have general appellate jurisdiction only over "final decisions of the district courts").

*Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989) (citation omitted). Nevertheless, we have held that

> *where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme*, the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim.

*Id.* (emphasis added); *accord, e.g.*, *Alleyne v. N.Y. State Educ. Dep't*, 516 F.3d 96, 101 (2d Cir. 2008). Here, plaintiffs argue that the "less rigorous fair-ground-for-litigation standard" should apply to their motion for a preliminary injunction, whereas defendants argue that the more rigorous likelihood-of-success standard should apply. The District Court applied the likelihood-of-success standard, and we agree that that was the correct standard to apply in the circumstances presented here.

First, as discussed in more detail below, the breathalyzer program qualifies as "governmental action taken in the public interest, " *Plaza Health*, 878 F.2d at 580, because it was designed, among other things, to discourage officers from using their firearms while intoxicated—which is plainly a matter of public concern. Second, the breathalyzer program constitutes "government action taken . . . pursuant to a statutory or regulatory scheme," *id.*, because the NYPD Commissioner promulgated Interim Order 52 under his statutory authority to regulate the police force. *See* N.Y. City Charter § 434 (providing that the Commissioner is the "chief executive officer of the police force" and "shall have cognizance and control of the government, administration, disposition and discipline of the department, and of the police force of the department" and "shall be chargeable with and responsible for the execution of all laws and the rules and regulations of the department"); *see also* N.Y. City Admin. Code § 14-115 (providing that the Commissioner has broad discretion over the discipline of the police force). Accordingly, the District Court correctly held that plaintiffs must

demonstrate a "likelihood of success on the merits" in order to secure a preliminary injunction in this action. *Plaza Health*, 878 F.2d at 580.

## II. The District Court's Denial of the Preliminary Injunction Was Not an Abuse of Discretion

We review the denial of a preliminary injunction for abuse of discretion. *See, e.g.*, *Alleyne*, 516 F.3d at 100. A district court has abused its discretion if it has (1) "based its ruling on an erroneous view of the law," (2) made a "clearly erroneous assessment of the evidence," or (3) "rendered a decision that cannot be located within the range of permissible decisions." *Sims v. Blot*, 534 F.3d 117, 132 (2d Cir. 2008) (internal quotation marks omitted); *cf. United States v. Hasan*, No. 08-4921-cr, — F.3d —, 2009 WL 3737521, at *4-5 (2d Cir. Nov. 10, 2009) (explaining "abuse of discretion").

The parties do not dispute that, assuming the breathalyzer program violates the Fourth Amendment, plaintiffs have demonstrated "irreparable harm." *See, e.g.*, *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (concluding that a possible deprivation of constitutional rights sufficiently demonstrated a likelihood of irreparable harm). It is also uncontested that the breathalyzer tests at issue here constitute "searches" and are therefore subject to the strictures of the Fourth Amendment. *See, e.g.*, *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 616-17 (1989).

The principal question, therefore, is whether plaintiffs have demonstrated a "likelihood of success on the merits." *Plaza Health*, 878 F.2d at 580. That question, in turn, depends on whether, on this record, the breathalyzer program is not "reasonable" under the Fourth Amendment.

"The Fourth Amendment requires that searches and seizures be reasonable," and a "search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). Nevertheless, the Supreme Court has "upheld certain regimes of suspicionless searches where the program was designed to serve special needs, beyond the normal need for law enforcement." *Id.* (internal quotation marks omitted); *see also United*

6

*States v. Amerson*, 483 F.3d 73, 80-81 (2d Cir. 2007) (summarizing the recent case law of the Supreme Court and this Circuit addressing the "special needs" doctrine).

A "program" or "general scheme" of searches qualifies for treatment under the special needs doctrine only if the program's "primary purpose" is *not* a "general interest in crime control." *Edmond*, 531 U.S. at 38, 46, 48; *accord Ferguson v. City of Charleston*, 532 U.S. 67, 83-84 (2001) (holding that the special needs doctrine does not apply to searches whose "immediate objective" is "to generate evidence *for law enforcement purposes*"); *Nicholas v. Goord*, 430 F.3d 652, 663 (2d Cir. 2005) (clarifying that the "special needs" doctrine applies only when the "searches serve as their immediate purpose an objective distinct from the ordinary evidence gathering associated with crime investigation").

Thus, in order to determine whether the special needs doctrine applies, a court must conduct "an inquiry into purpose at the programmatic level." *Edmond*, 531 U.S. at 46. In "'ordinary, probable cause Fourth Amendment analysis,'" a court does not investigate the purpose behind a search, as an "individual officer's subjective intentions are irrelevant to the [search's] Fourth Amendment validity." *Id.* at 45 (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)). But in the context of the "special needs" doctrine, a court must consider the "programmatic purpose" of the searches at issue, applying the "special needs" doctrine only if the primary programmatic purpose of the searches is unrelated to the government's general interest in crime control. *Id.* at 46.

If the court makes such a finding—that is, if the court finds that the primary purpose of a program of searches is a "special need" and not a general interest in crime control—the court must then conduct a "context-specific inquiry" into the "reasonableness" of the program, weighing "'the special need . . . against the privacy interest advanced.'" *Amerson*, 483 F.3d at 83 (quoting *Cassidy v. Chertoff*, 471 F.3d 67, 75 (2d Cir. 2006)). That task is accomplished by means of a "balancing test"

7

that is "based on an examination of three factors: '(1) the nature of the privacy interest involved; (2) the character and degree of the governmental intrusion; and (3) the nature and immediacy of the government's needs, and the efficacy of its policy in addressing those needs.'" *Id.* at 83-84 (quoting *Cassidy*, 471 F.3d at 75); *see also Illinois v. Lidster*, 540 U.S. 419, 427 (2004). The program of searches passes constitutional muster if it is "reasonable" under that three-factor balancing test. *Amerson*, 483 F.3d at 83.

## A. The District Court Properly Applied the Special Needs Doctrine

Plaintiffs argue that the special needs doctrine should not apply to the breathalyzer policy at issue here because the policy's primary purpose is furthering the NYPD's "general interest in crime control." *Edmond*, 531 U.S. at 48. Defendants dispute that claim and argue that the primary purpose of the breathalyzer policy is unrelated to crime control.

The record shows that the breathalyzer policy has multiple purposes. Some of the policy's purposes are related to "special needs" apart from the NYPD's general interest in crime control, but one of its purposes is directly related to the NYPD's role as an investigator of crimes.[2]

In opposition to plaintiffs' motion for a preliminary injunction, defendants submitted evidence—most notably an affidavit of Campisi, the chair of the committee that recommended the breathalyzer policy—showing that the breathalyzer policy was designed to address several issues unrelated to crime control. First, the NYPD conducts a detailed administrative review every time an

---

[2] Interim Order 52, the order that created the breathalyzer program, defines the program's purpose as follows:

> To ensure the highest levels of integrity at the scene of police involved firearms discharges which result in injury to or death of a person, on or off duty, within New York City.

J.A. 50. Evidence in the record casts light on the meaning of that language and provides additional purposes for the breathalyzer program.

officer fires his or her gun, and the breathalyzer program facilitates that review. To that end, it ensures that an officer who fires his or her gun while intoxicated—a clear violation of NYPD policy—can be quickly disciplined or removed from duty. That aim is not related to crime control; it is related to personnel management. The point is not to prosecute the offending officers but to remove them from duty or to impose on them internal, employment-related sanctions.

The breathalyzer program also operates as a deterrent to officers who may consider carrying their firearms while under the influence of alcohol. The NYPD acknowledges that some of its officers have alcohol problems, and the NYPD requires its officers to take precautions to avoid carrying their firearms into off-duty situations in which they may become intoxicated. Thus, the breathalyzer policy is designed to convey to NYPD officers the message that alcohol-related firearms incidents are likely to be discovered, providing an extra incentive to the officers to follow the NYPD's regulations regarding firearms and alcohol. Here again, the NYPD's interest is not in crime control but in personnel management; the breathalyzer program, in this respect, is more concerned with encouraging officers to follow the NYPD's internal safety policies than with prosecuting NYPD officers who violate the law. In this sense, this case very much resembles *Skinner v. Railway Labor Executives Association*, 489 U.S. 602 (upholding drug tests of railway employees immediately following serious train accidents in order to discipline those employees involved in the accident who had tested positive for drug use).

Another purpose of the breathalyzer program—apart from crime control—is promoting the NYPD's reputation among New York City residents. There is no dispute that the breathalyzer program was put in place in response to the shooting of Sean Bell, a widely publicized incident that generated criticism of the NYPD by some members of the public. In this context, the breathalyzer program is an effort to promote public confidence in the NYPD by showing the public that the

9

NYPD takes seriously its policies regarding alcohol and firearms. Moreover, when an officer fires his or her gun while *not* under the influence of alcohol, a breathalyzer test assures the public that the officer was fit for duty when he or she chose to fire. Here, the NYPD's interest is in maintaining strong community relations, not in crime control.

Nevertheless, even though the record shows that several of the purposes of the breathalyzer program are unrelated to crime control, the record also shows that one of the program's purposes is directly related to crime control. The NYPD acknowledges that it treats every shooting involving an officer as a potential crime and that the breathalyzer results could be used as evidence in a criminal investigation of the officer who was tested. In other words, to the extent that a police officer commits a crime by firing his or her gun, the NYPD is charged with investigating that crime, and the breathalyzer program is meant to be one investigatory tool at the NYPD's disposal.

There are, therefore, multiple purposes of the breathalyzer policy—some unrelated to crime control and one directly related to crime control—and the critical question in determining whether the special needs doctrine applies is whether the NYPD's general interest in crime control is the policy's "*primary* purpose." *Edmond*, 531 U.S. at 48 (emphasis added).

The District Court concluded that plaintiffs had failed to show a likelihood that they could prove that the NYPD's general interest in crime control is the primary purpose of the breathalyzer policy. In the District Court's words, "plaintiffs have proferred no evidence that [Interim Order] 52 is a regulation primarily concerned with law enforcement," nor have plaintiffs "shown that a primary purpose of the regulation is to generate evidence for prosecution." *Palladino*, 2008 WL 4539503, at *5. We hold that the District Court did not err in reaching that conclusion.

We also hold that, having found that the primary purpose of the breathalyzer policy was not crime control, the District Court correctly applied the special needs doctrine to evaluate the policy.

10

Here we must clarify one aspect of law surrounding the "special needs" doctrine: the special needs doctrine applies to any program of searches whose "primary purpose" is a government interest other than crime control, *Edmond*, 531 U.S. at 46-48, and the mere fact that crime control is *one* purpose—but not the *primary* purpose—of a program of searches does not bar the application of the special needs doctrine.

That conclusion, we think, derives naturally from prior case law. For example, in *Michigan Department of State Police v. Sitz*, 496 U.S. 444 (1990), the Supreme Court upheld highway sobriety checkpoints whose primary purpose was "reducing the immediate hazard posed by the presence of drunk drivers on the highways," *Edmond*, 531 U.S. at 39. We have no doubt, however, that aiding criminal prosecutions of drunk drivers was *another* purpose of the checkpoints. It was simply not the checkpoints' *primary* purpose. Likewise, in *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), the Supreme Court upheld border patrol checkpoints whose primary purpose was "intercept[ing] illegal aliens" and promoting "the Government's interests in policing the Nation's borders," *Edmond*, 531 U.S. at 37-38. Nonetheless, aiding criminal prosecutions of smugglers of illegal immigrants was, we think, *one* purpose of the boarder patrol checkpoints. It was simply not the checkpoints' *primary* purpose. And in *Cassidy*, this Circuit upheld baggage screening procedures whose primary purpose was "to detect and deter a potential 'transportation security incident.'" 471 F.3d at 70. That is not to say, of course, that aiding investigations and prosecutions of would-be terrorists was not *one* purpose of the baggage screening procedures. It was simply not the screening procedures' *primary* purpose.

Thus, even if crime control is *one* purpose of a program of searches, the program may nevertheless be reasonable under the special needs doctrine so long as crime control is not the program's primary purpose. As a result, even though the District Court found that crime control

11

was one purpose of the breathalyzer policy, the Court correctly applied the special needs doctrine upon finding that crime control was not the policy's *primary* purpose.

**B.** **The Breathalyzer Policy Is Reasonable Under the "Special Needs" Balancing Test**

After determining that the special needs doctrine applies, the next step of the inquiry is to assess the reasonableness of the breathalyzer policy by weighing "'the special need . . . against the privacy interest advanced'" under a three-factor balancing test. *Amerson*, 483 F.3d at 83 (quoting *Cassidy*, 471 F.3d at 75). The District Court declined to conduct this step of the inquiry, explaining that it would do so only "[o]n the basis of a fully developed record at the appropriate time." *Palladino*, 2008 WL 4539503, at *5 n.7. Nevertheless, to determine whether the District Court properly denied the motion for a preliminary injunction, we can and should conduct this step of the inquiry. *See, e.g.*, *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997) ("It is beyond cavil that an appellate court may affirm the judgment of the district court on any ground appearing in the record.").

First, as to the "the nature of the privacy interest involved," *Cassidy*, 471 F.3d at 75, we note that NYPD officers, like all law enforcement officials, "have a diminished expectation of privacy" when it comes to carrying and using firearms. *See Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 672 (1989) (upholding a drug testing program for employees of the United States Customs Service in part because "Customs employees . . . who are required to carry firearms in the line of duty . . . have a diminished expectation of privacy in respect to the intrusions occasioned by a [drug test]"). Indeed, NYPD officers are already subject to drug screening as part of their employment in the NYPD,[3] and although breathalyzer testing may be intrusive in some workplaces, the

---

[3] An NYPD officer is subject to drug or alcohol tests at many different times in his or her career, including when an officer first enters service in the NYPD as a probationary police officer

"operational realities of the workplace" for NYPD officers "render entirely reasonable certain work-related intrusions by supervisors and co-workers that might be viewed as unreasonable in other contexts." *Id.* at 671 (internal quotation marks omitted).

Second, as to "the character and degree of the governmental intrusion," *Cassidy*, 471 F.3d at 75, we note that NYPD officers who discharge their weapons are, under separate, preexisting NYPD policies, already subject to close scrutiny in the form of an administrative investigation. Thus, we do not think that a breathalyzer test is an "unexpected intrusion[ ] on privacy." *Von Raab*, 489 U.S. at 672 n.2; *see also Martinez-Fuerte*, 428 U.S. at 559 (upholding highway checkpoints in part because motorists "are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints"). In addition, the breathalyzer policy is applied uniformly in *every* situation in which an NYPD officer causes injury by firing his or her gun. As a result, the breathalyzer policy does not "carry the grave potential for 'arbitrary . . . interference with . . . privacy['] . . . that the Fourth Amendment was designed to prevent." *Von Raab*, 489 U.S. at 672 n.2 (quoting *Martinez-Fuerte*, 428 U.S. at 554).

Third, as to the "the nature and immediacy of the government's needs" and "the efficacy of its policy in addressing those needs," *Cassidy*, 471 F.3d at 75, we think that the government's needs here are manifest and that the breathalyzer policy straightforwardly addresses those needs. Like the Customs Service employees in *Von Raab*, NYPD officers "who may use deadly force plainly 'discharge duties fraught with such risks of injury to others that even a momentary lapse of attention

---

and again at the end of the officer's probationary period; when an officer applies for specialty assignments, such as an assignment to the NYPD's Organized Crime Control Bureau; when there is a reasonable suspicion that an officer has ingested a controlled substance; and when an officer has been placed on disciplinary probation because he or she caused injury by driving a motor vehicle while intoxicated. NYPD officers are also subject to random drug tests throughout their service in the NYPD.

can have disastrous consequences.'" 489 U.S. at 670 (quoting *Skinner*, 489 U.S. at 628). Thus, the NYPD's regulations involving alcohol and firearms are vital to public safety, and the NYPD has a substantial interest in detecting and disciplining officers who violate those policies. The NYPD also has a substantial interest in deterring its officers from using their firearms while intoxicated. *Cf. Cassidy*, 471 F.3d at 70 (upholding baggage screening procedures whose purpose was, in part, to "deter" terrorist attacks). Indeed, the breathalyzer policy may actually promote the purpose of the Fourth Amendment. As the Supreme Court has noted, "ensuring against the creation of this dangerous risk will itself further Fourth Amendment values, as the use of deadly force may violate the Fourth Amendment in certain circumstances." *Von Raab*, 489 U.S. at 671 (citing *Tennessee v. Garner*, 471 U.S. 1, 7-12 (1985)). By quickly and unequivocally determining whether alcohol was involved in an NYPD officer's use of his or her firearm, the breathalyzer policy will assist the NYPD in disciplining officers who use their firearms while intoxicated and will provide an incentive to officers to stow their firearms before drinking alcohol.

Finally, we recognize that the NYPD's reputation in the eyes of the public is directly tied to its effectiveness as a police force. *See, e.g.*, *Pappas v. Giuliani*, 290 F.3d 143, 149 (2d Cir. 2002) (explaining that negative "public perception . . . [can] harm the mission of the Police Department"); *see also Lidster*, 540 U.S. at 425 (noting that information volunteered by the public plays a "vital role in police investigatory work"). Thus, to the extent that the breathalyzer policy improves the NYPD's public reputation, it furthers an important governmental interest.

In light of each of these factors, we conclude that "'the special need[s]'" asserted by the NYPD outweigh the "'privacy interest advanced'" by plaintiffs. *Amerson*, 483 F.3d at 83 (quoting *Cassidy*, 471 F.3d at 75). Accordingly, we hold that, on the record before us, plaintiffs have not demonstrated a "likelihood of success on the merits," *Plaza Health*, 878 F.2d at 580, because the

14

breathalyzer program is reasonable under the Fourth Amendment, based on this record. As a result, the District Court did not abuse its discretion in denying plaintiffs' motion for a preliminary injunction.

## CONCLUSION

In summary:

(1) The NYPD's breathalyzer policy constitutes "governmental action taken in the public interest pursuant to a statutory or regulatory scheme," and thus the District Court correctly applied the likelihood-of-success standard in evaluating plaintiffs' motion for a preliminary injunction.

(2) The District Court did not commit clear error in finding that the primary purpose of the breathalyzer policy was not the NYPD's general interest in crime control.

(3) The fact that crime control is *one* purpose—but not the *primary* purpose—of a program of searches does not bar the application of the special needs doctrine. Thus, even though the District Court found that crime control was one purpose of the NYPD breathalyzer policy, the District Court correctly applied the special needs doctrine after finding that crime control was not the primary purpose of the policy.

(4) Applying the special needs doctrine's three-factor balancing test, the NYPD breathalyzer program is reasonable under the Fourth Amendment based on the record at this stage of the proceedings.

Accordingly, the District Court did not err in denying plaintiffs' motion for a preliminary injunction, and the September 30, 2008 order of the District Court is **AFFIRMED**.

15