21-2535(L)
*JLM Couture, Inc. v. Gutman*

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
# 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔖𝔢𝔠𝔬𝔫𝔡 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

---

August Term 2023
Argued: September 19, 2023
Decided: January 17, 2024

Nos. 21-2535; 22-1694

---

JLM COUTURE, INC.,

*Plaintiff-Appellee,*

v.

HAYLEY PAIGE GUTMAN,

*Defendant-Appellant.*[*]

---

On Appeal from the United States District Court
for the Southern District of New York

---

Before:   CALABRESI, PARK, and NARDINI, *Circuit Judges.*

Fashion designer and social-media influencer Hayley Paige
Gutman challenges a preliminary injunction and contempt order

---

[*] The Clerk of Court is respectfully directed to amend the official caption
as set forth above.

entered against her in litigation with her former employer, JLM Couture, Inc. The district court (Swain, *C.J.*) issued a preliminary injunction awarding JLM sole control of two social-media accounts—an Instagram Account and a Pinterest Account (together, the "Disputed Accounts")—and preliminary enforcement of a five-year restrictive covenant prohibiting Gutman from "identifying herself" as a designer of certain goods. The district court also held Gutman in civil contempt for a series of Instagram posts that it found to be "marketing" in violation of an earlier version of the preliminary injunction. Gutman argues on appeal that this was reversible error and that the preliminary injunction should be dissolved.

We **DISMISS** Gutman's appeal from the district court's interlocutory contempt order for lack of appellate jurisdiction. We **AFFIRM** the district court's refusal to dissolve its preliminary injunction based on the law of the case. We **VACATE** in part the district court's order modifying its preliminary injunction because it erred in determining ownership of the Disputed Accounts and failed to assess the reasonableness of the five-year noncompete restraint on Gutman. We thus **REMAND** for further proceedings consistent with this opinion.

—————

SARAH M. MATZ, Adelman Matz P.C., New York, NY (Gary Adelman, Adelman Matz P.C., New York, NY, *on the brief*), *for Plaintiff-Appellee*.

JOSEPH C. LAWLOR, Haynes & Boone, LLP, New York, NY (Richard D. Rochford, Jr., Haynes & Boone, LLP, New York, NY, *on the brief*), *for Defendant-Appellant*.

2

PARK, *Circuit Judge*:

Fashion designer and social-media influencer Hayley Paige Gutman challenges a preliminary injunction and contempt order entered against her in litigation with her former employer, JLM Couture, Inc. The district court (Swain, *C.J.*) issued a preliminary injunction awarding JLM sole control of two social-media accounts—an Instagram Account and a Pinterest Account (together, the "Disputed Accounts")—and preliminary enforcement of a five-year restrictive covenant prohibiting Gutman from "identifying herself" as a designer of certain goods. The district court also held Gutman in civil contempt for a series of Instagram posts that it found to be "marketing" in violation of an earlier version of the preliminary injunction. Gutman argues on appeal that this was reversible error and that the preliminary injunction should be dissolved.

We dismiss Gutman's appeal from the district court's interlocutory contempt order for lack of appellate jurisdiction. We affirm the district court's refusal to dissolve its preliminary injunction based on the law of the case. We vacate in part the district court's order modifying its preliminary injunction because it erred in determining ownership of the Disputed Accounts and failed to assess the reasonableness of the five-year noncompete restraint on Gutman. We thus remand for further proceedings consistent with this opinion.

## I. BACKGROUND

A.  Factual Background

1.  *Employment History*

In July 2011, Hayley Paige Gutman signed an employment agreement with JLM (the "Contract"). *See* Appellant's App'x at 376-

3

94.     Gutman agreed to design a line of bridal wear in exchange for a salary plus "additional compensation" tied to the sales of the products she designed. *See* Contract ¶ 4. The contract included provisions to protect JLM's investment in Gutman's name and brand association. Thus, among other terms, Gutman: (1) agreed not to use her name (or any derivatives of her name) in commerce once JLM registered a trademark thereof, *id.* ¶ 10(b)-(d); (2) agreed that various categories of creative material she produced would be JLM's property, *id.* ¶¶ 11-12; and (3) agreed to certain noncompete, nonsolicit, and nondisclosure restrictions, *id.* ¶ 9. The Contract allowed JLM to fire Gutman at any time, with or without cause, but included no provision for Gutman to terminate the arrangement. Although the parties amended the Contract in 2014, and JLM later exercised an option to extend it through August 1, 2022, the relevant features remained the same throughout the term of the Contract.

In 2019, the parties attempted to negotiate amendments to the Contract but were unable to reach agreement. That November, Gutman changed the passwords to the Disputed Accounts and refused to give JLM access. Although the accounts had been used to post content advertising JLM's products, Gutman informed JLM that she would "not be posting any JLM related business." *JLM Couture, Inc. v. Gutman*, No. 20-cv-10575, 2021 WL 827749, at *6 (S.D.N.Y. Mar. 4, 2021). JLM then filed this lawsuit. Relevant here, JLM alleged that Gutman had breached the Contract and that she was liable for conversion and trespass to chattels for taking control of the Disputed Accounts.

4

## 2. *The Disputed Accounts*

Gutman created the Pinterest Account on November 3, 2011 and the Instagram Account on or about April 6, 2012. For both, she used the handle "@misshayleypaige," a derivative of her name that she had used for other social-media profiles not in dispute, including several that were created before her employment with JLM. The Disputed Accounts were created using Gutman's name, personal cell phone number, and a personal email account that she also used for work purposes. She created her own passwords.

JLM did not direct Gutman to open the accounts. Gutman says she created them at the suggestion of a friend. JLM argues that she must have created them to advertise for the company, as the Contract required her to "perform such other duties and services commensurate with her position . . . as may be assigned to her by an officer of the Company, including . . . assisting with advertising programs." Contract ¶ 2.

Although the district court did not find that Gutman created the Disputed Accounts for JLM, it did find that "the Instagram Account was utilized to showcase JLM's products almost immediately after its creation." Special App'x at 18. It also found credible the testimony of JLM's CEO that the creation of the Instagram Account was "timed to coincide with the week of the Fall 2012 New York bridal market." *Id.* The district court further noted that JLM products were featured in several of Gutman's early posts to the Instagram Account.

Gutman's earliest posts include pictures of wedding dresses, as well as pictures of the New York City skyline, chairs, dogs, a wine bottle, and what appears to be a beach vacation.

5

Over time, however, the Disputed Accounts came to serve as "critical advertising platforms" for JLM's products. *JLM Couture, Inc. v. Gutman*, No. 20-cv-10575, 2023 WL 2503432, at *4 (S.D.N.Y. Mar. 14, 2023). In addition to posts depicting bridal gowns, the Disputed Accounts provided information about JLM's promotional events, and Gutman used Instagram's messaging function to respond to sales inquiries. Promotional posts were interspersed with more personal content, in a strategy that JLM referred to as the "personal glimpse." Special App'x at 26. Other JLM employees came to assist in managing the Disputed Accounts and responding to customer messages and, by 2019, at least two other employees had access to the Instagram Account.

B.    Procedural History

1.    *Preliminary Injunction and Contempt Order*

On March 4, 2021, after discovery and an evidentiary hearing, the district court entered a preliminary injunction against Gutman. *Gutman*, 2021 WL 827749, at *1. As relevant here, the district court enjoined Gutman from:

> [b]reaching the employment Contract, dated July 13, 2011, together with the amendments and extensions thereto, by . . . [d]irectly or indirectly, engaging in, or being associated with . . . , any person, organization or enterprise which engages in the design, manufacture, marketing or sale of: (i) bridal apparel, including bridesmaids', mother of the bride and flower girls' apparel and related items; (ii) bridal accessories and related items; (iii) evening wear and related items; and/or (iv) any other category of goods designed, manufactured, marketed, licensed or sold by JLM.

6

*Id.* at *23.   The district court later denied Gutman's request for reconsideration but modified the preliminary injunction to expire on August 1, 2022, when the Contract expired.   *See JLM Couture, Inc. v. Gutman*, No. 20-cv-10575, 2021 WL 2227205, at *8 (S.D.N.Y. June 2, 2021).

In a previous appeal, this Court affirmed the preliminary injunction in part and vacated it in part.   *JLM Couture, Inc. v. Gutman*, 24 F.4th 785, 801-02 (2d Cir. 2022).   We affirmed with respect to (1) Paragraph 3(a) of the preliminary injunction, which prohibited Gutman from using her name or derivatives in trade or commerce, *id.* at 796; (2) Paragraph 3(b) of the preliminary injunction, which prohibited Gutman from competing with JLM through the expiration of the Contract on August 1, 2022, *id.* at 795; and (3) the district court's ruling that JLM did not breach the Contract by failing to pay Gutman after she stopped working, *id.* at 801.

We vacated the portion of the preliminary injunction that awarded JLM control of the Disputed Accounts because the district court had neither concluded that JLM was likely to succeed on the merits of its conversion or trespass claims nor tied the injunctive relief to JLM's breach-of-contract claim.   *Id.* at 797-800.   We noted that, on remand, the district court could either "choose to answer directly the question of JLM's likelihood of success on the merits of its conversion and trespass claims, properly weigh the relevant injunction factors, and grant or deny injunctive relief accordingly"; "decide that the balance of equities favors denying any property-based injunction and thereby avoid the merits question, leaving Gutman in control of the Disputed Accounts"; or "modify the vacated portion of the injunction

7

to provide JLM with relief for JLM's breach-of-contract claims that stems from Gutman's obligations under the Contract." *Id.* at 800.

While Gutman's first appeal was pending, the district court held her in contempt of the preliminary injunction based on a series of Instagram posts teasing her return to the bridal industry. *JLM Couture, Inc. v. Gutman*, No. 20-cv-10575, 2021 WL 4084573, at *1-3 (S.D.N.Y. Sept. 8, 2021). The district court reasoned that these posts constituted marketing of competitive goods, and it ordered Gutman to remove them within five days, not to post the same or similar content, and not to announce the name of her new brand. *Id.* at *4-5, *9. It further ordered Gutman to pay $5,000 for each day she remained out of compliance with the injunction. *Id.* at *9. Gutman filed a notice of appeal. Notice of Civil Appeal, *JLM Couture, Inc. v. Gutman*, No. 21-2535 (2d Cir. Oct. 8, 2021), ECF No. 1.

2.      *Modified Preliminary Injunction*

On remand, the district court concluded that the Disputed Accounts were advertising platforms that JLM was contractually entitled to access. *See JLM Couture, Inc. v. Gutman*, No. 20-cv-10575, 2022 WL 5176849, at *4 (S.D.N.Y. Feb. 14, 2022). The district court thus modified the preliminary injunction to give both parties access to the Disputed Accounts through the term of the Contract based on JLM's breach-of-contract claim. *Id.* at *7. The court further enjoined Gutman from using the Disputed Accounts for any "non-JLM promotional purposes." *Id.* Gutman filed another notice of appeal. Notice of Civil Appeal, *JLM Couture, Inc. v. Gutman*, No. 22-549 (2d Cir. Mar. 17, 2022), ECF No. 1.

The preliminary injunction terms giving JLM control over the Disputed Accounts and enjoining Gutman from competitive

8

employment were based on JLM's breach-of-contract claims, so they were set to expire with the Contract on August 1, 2022. *See Gutman*, 2022 WL 5176849, at *7. The district court thus requested briefing on any modifications that might be warranted in light of the approaching expiration date. Order, *JLM Couture, Inc. v. Gutman*, No. 20-cv-10575 (S.D.N.Y. May 5, 2022), ECF No. 344. Both parties requested modifications.

Gutman moved for dissolution of the preliminary injunction based on JLM's failure to pay her compensation allegedly due under the Contract in March 2022. The district court rejected this argument. It ruled that Gutman had already raised the same claim in an earlier motion for dissolution and, construing her argument as a motion for reconsideration, denied the motion. *See JLM Couture, Inc. v. Gutman*, No. 20-cv-10575, 2022 WL 2916600, at *3-4 (S.D.N.Y. July 25, 2022), *reissued and amended* No. 20-cv-10575, 2023 WL 2499581, at *3-4 (S.D.N.Y. Mar. 14, 2023).

JLM moved for several modifications to the preliminary injunction, two of which the district court granted. First, the district court modified the preliminary injunction to give JLM exclusive control over the Disputed Accounts based on JLM's likelihood of success on its claims for conversion and trespass to chattels. *See JLM Couture, Inc. v. Gutman*, 616 F. Supp. 3d 359, 383 (S.D.N.Y. 2022), *reissued and amended* No. 20-cv-10575, 2023 WL 2503432, at *9 (S.D.N.Y. Mar. 14, 2023). Second, the court prohibited Gutman from "identifying herself" to the public as a designer of competing goods for five years based on Paragraph 10(e) of the Contract, which it interpreted as a post-employment restrictive covenant. *See id.* at 388.

9

Gutman appealed from the district court's denial of her request for dissolution of the preliminary injunction and its grant of JLM's requested modifications.  Notice of Civil Appeal, *JLM Couture, Inc. v. Gutman*, No. 22-1694 (2d Cir. Aug. 4, 2022), ECF No. 1.  These two appeals and her appeal of the district court's contempt order were consolidated before this Court.  Order, *Gutman*, No. 21-2535 (2d Cir. Aug. 23, 2022), ECF No. 65.[1]

## II. DISCUSSION

We review contempt orders for abuse of discretion.  *Chevron Corp. v. Donziger*, 990 F.3d 191, 202 (2d Cir. 2021).  We also review for abuse of discretion the grant, denial, or modification of a preliminary injunction.  *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011) (grant or denial); *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 141 (2d Cir. 2005) (modification).

A district court has abused its discretion if it "(1) based its ruling on an erroneous view of the law, (2) made a clearly erroneous assessment of the evidence, or (3) rendered a decision that cannot be

---

[1] On February 21, 2023, this Court remanded Gutman's appeal from the district court's orders of July 25, 2022 (Docket No. 22-1694) and dismissed as moot her appeal from its order of February 14, 2022 (Docket No. 22-549).  Order, *Gutman*, No. 21-2535 (2d Cir. Feb. 21, 2023), ECF No. 183.  Although moot, the appeal docketed at 22-549 had divested the district court of jurisdiction to enter the July 25, 2022 orders, so an appeal from those orders was not properly before this Court at that point.  *Id*.  We therefore instructed the district court to reissue the July 25 orders, this time with proper jurisdiction.  *Id.*  The district court did so, *see* Am. Mem. Order, *Gutman*, No. 20-cv-10575 (S.D.N.Y. Mar. 14, 2023), ECF No. 430; Am. Op. & Order Modifying Prelim. Inj., *Gutman*, No. 20-cv-10575 (S.D.N.Y. Mar. 14, 2023), ECF No. 431, and this appeal was reinstated on March 30, 2023, Order, *Gutman*, No. 21-2535 (2d Cir. Mar. 30, 2023), ECF No. 191.

located within the range of permissible decisions." *Oneida Nation of N.Y.*, 645 F.3d at 164 (quoting *Lynch v. City of New York*, 589 F.3d 94, 99 (2d Cir. 2009)). Factual findings are reviewed for clear error; conclusions of law are reviewed de novo. *Id.*

In this consolidated appeal, Gutman challenges three orders of the district court. We address each in turn.

A.    Contempt Order

First, Gutman challenges the district court's September 8, 2021 contempt order. Before addressing the merits, however, we must ensure that we have jurisdiction to hear Gutman's appeal. *Uniformed Fire Officers Ass'n v. de Blasio*, 973 F.3d 41, 46 (2d Cir. 2020). Here, we do not.

An order of civil contempt may ordinarily be challenged on appeal only after the entry of final judgment. *Int'l Bus. Machs. Corp. v. United States*, 493 F.2d 112, 114-15 (2d Cir. 1973). But orders "granting, continuing, modifying, refusing or dissolving injunctions" are immediately appealable. 28 U.S.C. § 1292(a)(1). These categories are narrowly drawn, and orders merely clarifying or interpreting injunctions do not create appellate jurisdiction. *Weight Watchers Int'l*, 423 F.3d at 141.

Clarifications and interpretations can look like modifications. Indeed, an erroneous interpretation that extends an injunction "beyond its original reach" can amount to a modification warranting immediate review. *In re Tronox Inc.*, 855 F.3d 84, 98 (2d Cir. 2017). But district courts are entitled to deference when interpreting their own injunctions, including an injunction's "original reach." *Id.* at

11

98-99.   Only an "obvious or blatant" misinterpretation rises to the level of a modification permitting interlocutory review.   *Id.* at 99.

Here, Gutman argues that we have jurisdiction because the contempt order modifies Paragraph 3(b) of the preliminary injunction.   At the time of Gutman's alleged violations, that paragraph enjoined her from:

> directly or indirectly, engaging in . . . the design, manufacture, marketing or sale of: (i) bridal apparel . . . ; (ii) bridal accessories and related items; (iii) evening wear and related items; and/or (iv) any other category of goods designed, manufactured, marketed, licensed or sold by JLM.

*Gutman*, 2021 WL 4084573, at *1.   Gutman argues that the contempt order modified this paragraph by (1) prohibiting her from announcing a new brand name for any venture that would compete with JLM, and (2) prohibiting her from posting "any similar content" to the Instagram Account and imposing a monetary fine for each day she remains noncompliant.   *See id.* at *8-9.

We disagree. The alleged modifications are merely interpretations of the original preliminary injunction with which Gutman disagrees.   We thus lack appellate jurisdiction to review the contempt order.

*Competing Brand Name.*   In June 2021, Gutman posted a video on Instagram announcing that she would launch a new bridal brand in August 2022.   In its contempt order, the district court reasonably concluded that such behavior constituted "marketing" in violation of the injunction.   If advertising Gutman's planned return to the industry is "marketing," so too is announcing the name under which

12

she plans to compete.   The district court's instruction that Gutman not announce that name merely interprets the injunction and thus does not create appellate jurisdiction.

*"Similar Content."*   In its contempt order, the district court identified six Instagram posts that violated the preliminary injunction.   It ordered Gutman to remove those posts within five days and not to post the same or similar content on pain of a $5,000 penalty for each day she remained out of compliance with the order. In context, then, "similar content" is content that violates the preliminary injunction in a way that is similar to the posts at issue in the contempt order.   And only posts that would independently violate Paragraph 3(b) of the injunction, at least as that provision was interpreted in the contempt order, would qualify as "similar content." As a result, this instruction would constitute a modification only if the district court misinterpreted Paragraph 3(b).

But the district court's interpretation of Paragraph 3(b) is reasonable.   It explained at length why Gutman's promotion of her return to the bridal industry and various videos of her sketching dress designs—including a design she had previously created for JLM—constituted prohibited "marketing" under the preliminary injunction.

The contempt order did not grant, continue, modify, refuse, or dissolve an injunction, so Gutman must await final judgment before she can appeal it.[2]   We thus dismiss her appeal from the contempt order.

---

[2] To the extent that Gutman asks this Court to exercise pendent jurisdiction, we decline to do so.   Gutman identifies no "inextricably intertwined" interlocutory order over which this Court has appellate

B. Denial of Motion To Dissolve the Preliminary Injunction

Gutman next argues that JLM is not entitled to a preliminary injunction because it chose to terminate the Contract as its remedy for Gutman's alleged breach. We disagree.

When one party breaches a contract, their counterparty must ordinarily choose between "declaring a breach and terminating the contract or, alternatively, . . . continuing to perform under the contract." *Todd Eng. Enters. LLC v. Hudson Home Grp., LLC*, 171 N.Y.S.3d 474, 476 (1st Dep't 2022) (quoting *Rebecca Broadway L.P. v. Hotton*, 143 37 N.Y.S.3d 72, 79 (1st Dep't 2016)).

Gutman asserts that JLM is trying to have it both ways: although JLM requested and received a preliminary injunction enforcing certain contract terms, it has failed to pay her as required under other parts of the Contract. But we rejected this argument in Gutman's prior appeal. The Contract provides that "[f]or the full, prompt and faithful performance of all the duties and services to be performed by [Gutman] hereunder, [JLM] agrees to pay, and [Gutman] agrees to accept, the amounts set forth" as base and additional compensation. *Gutman*, 24 F.4th at 801. "Faithful performance is thus a condition precedent to payment of base and additional compensation, so JLM had no duty to pay Gutman if she did not work." *Id*.

---

jurisdiction that might justify such a step. *See Myers v. Hertz Corp.*, 624 F.3d 537, 552-53 (2d Cir. 2010). And in any event, pendent jurisdiction is a discretionary doctrine applied only "rarely," "sparingly," and in "exceptional circumstances," "if ever." *Id.* at 553; *Jones v. Parmley*, 465 F.3d 46, 65 (2d Cir. 2006).

14

"When a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case," absent "cogent and compelling" reasons to the contrary. *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (cleaned up). Here, Gutman identifies no material difference between JLM's refusal to pay "additional compensation" due in March 2022—the "breach" Gutman now alleges—and the compensation allegedly due in March 2021 that we considered previously. The district court thus correctly denied Gutman's motion for dissolution of the preliminary injunction based on JLM's alleged breach of the Contract.

C.    Modification to the Preliminary Injunction

   1.    *Social-Media Account Ownership*

      a.    Ownership Analysis

Gutman next argues that the district court erred by modifying its preliminary injunction to give JLM exclusive control over the Disputed Accounts. We agree.

The district court revised its injunction before the Contract was set to expire on August 1, 2022. In doing so, it evaluated JLM's likelihood of success on the merits of its claims for conversion and trespass to chattels. As the court noted, "[t]he issue of ownership of a social media account is novel, and few courts have examined the question." *Gutman*, 616 F. Supp. 3d at 375.

To resolve the issue, the district court identified six factors "at the core of a proper social media account ownership inquiry."

15

*Gutman*, 2023 WL 2503432, at *10.[3]   Based on these factors, the district court ruled that "JLM has established [a] clear likelihood of success in demonstrating that it owns the Instagram Account and Pinterest Account or (to the extent Ms. Gutman or the relevant platforms may hold title to the Accounts) has a right to use and control the Accounts vastly superior to any such right of Ms. Gutman."   *Id.* at *15.

The district court expressly declined to consider whether Gutman owned the Disputed Accounts when they were created.   *See id.* at *11.   It stated that such an approach would be "overly simplistic, and the dynamics of social media warrant a much fuller examination of how the accounts were held out to the public, the purposes for which the accounts were used, and the methods by which the accounts were managed."   *Id.*

We conclude that this approach was error.   The law has long accommodated new technologies within existing legal frameworks. *See, e.g.*, *Kyllo v. United States*, 533 U.S. 27, 33-40 (2001) (holding that the use of thermal imaging technology can constitute a search under the Fourth Amendment); *Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 292-93 (2007) (treating electronic records as property equivalent to physical records for the purposes of conversion).   We see no reason to depart from this traditional approach here.   Determining

---

[3] They are: "(1) whether the account handle reflects the business or entity name; (2) how the account describes itself; (3) whether the account was promoted on the entity's advertisements or publicity materials; (4) whether the account includes links to other internet platforms of the entity; (5) the purpose for which the account was used, including whether it was tied to promotional or mission-oriented activities of the entity; and (6) whether employees or members of the entity had access to the account and participated in its management."   *Gutman*, 2023 WL 2503432, at *10.

the ownership of social-media accounts is indeed a relatively novel exercise, but that novelty does not warrant a new six-factor test.[4]

The Disputed Accounts should be treated in the first instance like any other form of property. This includes determining the original owner. *See Pierson v. Post*, 3 Cai. 175 (N.Y. 1805) (determining original owner of a fox); *Lightfoot v. Davis*, 198 N.Y. 261, 265 (1910) (discussing the principle of title by first possession); *see also* Carol M. Rose, *Possession as the Origin of Property*, 52 U. Chi. L. Rev. 73, 73 (1985). When Gutman created the Disputed Accounts, any associated property rights belonged to *someone*. And if she created them using her personal information and for her personal use, then those rights belonged to her, no matter how the Disputed Accounts may have been used later.[5] *See* 2 William Blackstone, *Commentaries* *389.

If the district court concludes that Gutman owned the Disputed Accounts at creation, it will then need to consider whether JLM

---

[4] To be sure, the district court relied on two cases in adopting its test—*In re CTLI, LLC*, 528 B.R. 359 (Bankr. S.D. Tex. 2015), and *International Brotherhood of Teamsters Local 651 v. Philbeck*, 464 F. Supp. 3d 863 (E.D. Ky. 2020). But neither interprets New York law, which governs here. *See Gutman*, 2023 WL 2503432, at *9-10.

[5] In evaluating the initial ownership of the Disputed Accounts, we note that Gutman's use of the "@misshayleypaige" username does not support a presumption that she created the account for business purposes. First, Gutman had licensed her name and its derivatives to JLM for use only in trade or commerce. Contract ¶ 10(b). She was entitled to continue using her name for noncommercial purposes, including personal social-media accounts. Second, even if Gutman created the Disputed Accounts for commercial purposes, it remains possible that she did so on her own behalf and in violation of the Contract.

subsequently took ownership by operation of the Contract.[6] Traditional principles of property law guide this analysis. Thus, the fact that Gutman transferred some or all of her rights in particular content posted on the Disputed Accounts does not by itself support an inference that she transferred ownership of the Disputed Accounts themselves.[7] Nor should it ordinarily matter to the question of ownership whether an account owner permits others to assist in managing the account, or whether one or the other party holds itself out as owning it. *See, e.g.*, *Meisels v. Meisels*, 630 F. Supp. 3d 400, 411 (E.D.N.Y. 2022) (management of rental property not probative of ownership); *Porter v. Wertz*, 53 N.Y.2d 696, 698 (1981) (permitting suit for recovery of a painting purchased from a middleman who lacked authority to sell the painting). Determining ownership by reference

---

[6] It appears that ownership of the Disputed Accounts may depend at least in part on the terms of service governing their creation and use. *See, e.g.*, *Eagle v. Morgan*, No. 11-cv-4303, 2013 WL 943350, at *11 (E.D. Pa. 2013) (discussing LinkedIn's User Agreement). The district court may thus consider on remand what rights are inherent in "ownership" of the Disputed Accounts and whether they include the right to transfer or assign those accounts.

[7] Rights in the Disputed Accounts and rights in content posted on them—including ancillary content like direct messages, captions, profile pictures, and the like—need not be intertwined. *See, e.g.*, *Agence Fr. Presse v. Morel*, 934 F. Supp. 2d 547, 562-63 (S.D.N.Y.) (discussing Twitter's terms of service providing that "users retain their rights to the content they post"), *reconsideration granted in part on other grounds*, 934 F. Supp. 2d 584 (S.D.N.Y. 2013); *Sinclair v. Ziff Davis, LLC*, 454 F. Supp. 3d 342, 345 (S.D.N.Y. 2020) (discussing Instagram's terms of service providing that the user grants to Instagram "a non-exclusive, fully paid and royalty-free, transferable, sub-licensable, worldwide license" to the content they post), *reconsideration granted in part on other grounds*, 2020 WL 3450136 (S.D.N.Y. June 4, 2020).

to such principles would promote transfer by surprise and complicate contractual arrangements under which an account owner might agree to advertise another's goods on his or her platform.[8]

Moreover, the district court erred by concluding that JLM is likely to succeed in demonstrating ownership of the Disputed Accounts under Paragraph 11 of the Contract.[9]   *See Gutman*, 2023 WL 2503432, at *15.   That paragraph provides that all "designs, drawings, notes, patterns, sketches, prototypes, samples, improvements to existing works, and any other works conceived of or developed by [Gutman] in connection with her employment with the Company involving bridal clothing, bridal accessories and related bridal or wedding items," are works for hire and the exclusive property of JLM.   Contract ¶ 11.

The district court ruled that the Disputed Accounts themselves qualify as "any other works" conceived of or developed by Gutman in connection with her employment.   It thus concluded that Gutman

---

[8] To the extent that the district court held that JLM has a superior right to use and control the Disputed Accounts, it erred by relying on its six-factor ownership test.   If the district court concludes on remand that Gutman owns the Disputed Accounts, it could still find that JLM has a superior right of possession.   But that conclusion would depend on identifying the nature and source of any superior possessory interest.   *See, e.g.*, Restatement (Second) of Torts § 225 (discussing persons entitled to immediate possession); *cf. Guiffrida v. Storico Dev., LLC*, 876 N.Y.S.2d 793, 795 (4th Dep't 2009) (holding that tenants could sue for conversion because they had an immediate superior contractual right to possession).

[9] We do not, however, disturb the district court's application of that provision as it relates to JLM's likelihood of success in showing ownership of particular content posted on the Disputed Accounts or compilations of posted content.   *Gutman*, 2023 WL 2503432, at *15.

19

likely assigned them to JLM in the Contract. But the ordinary meaning of general terms at the end of a list must be interpreted to "embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates v. United States*, 574 U.S. 528, 545 (2015) (quoting *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003)) (applying *ejusdem generis*). Otherwise, giving general terms an "all-encompassing" meaning would render specifically enumerated terms surplusage. *See id.* at 545-46 (quoting *Begay v. United States*, 553 U.S. 137, 142 (2008)).

Here, the specific terms—"designs, drawings, notes, patterns, sketches, prototypes, samples, [and] improvements to existing works"—are all closely related. Contract ¶ 11. They describe steps in the process of fashion design and capture much (if not all) of the creative output that Gutman might produce in her role as a designer. Moreover, the enumerated terms are all items that JLM might conceivably sell to the public and appear to be presumptively copyrightable. *See* 17 U.S.C. § 102(a) *et seq.* The Disputed Accounts by contrast share none of these core attributes, despite featuring content that does, such as sketches and drawings of wedding dresses.[10] It would thus be inconsistent with ordinary principles of

---

[10] Although the copyrightability of the Disputed Accounts is not before us, we note that, at the very least, the functional portions of social-media accounts are likely ineligible for protection. *See Compendium of U.S. Copyright Office Practices* § 1006-07 (3d ed. 2021). Further, it is an open question in this Circuit whether the overall "look and feel" of a website may be copyrightable. *See ID Tech LLC v. Toggle Web Media LLC*, No. 20-cv-5949, 2023 WL 2613625, at *6-7 & n.7 (E.D.N.Y. Mar. 23, 2023) (collecting cases).

contract interpretation to conclude that Paragraph 11 of the Contract assigned the Disputed Accounts to JLM.

To summarize: the analysis of social-media-account ownership begins where other property-ownership analyses usually begin—by determining the account's original owner. The next step is to determine whether ownership ever transferred to another party. If a claimant is not the original owner and cannot locate their claim in a chain of valid transfers, they do not own the account.

We thus remand to the district court to analyze ownership of the Disputed Accounts under the framework discussed above.

> b. Standard for Granting Preliminary Injunctive Relief

The next question is what standard JLM must satisfy on remand to obtain its requested preliminary injunctive relief. We have recognized two different standards governing preliminary injunctions. The first requires the party seeking a preliminary injunction to demonstrate that "(1) absent injunctive relief, he will suffer irreparable injury, and (2) there is a likelihood that he will succeed on the merits of his claim." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006) (cleaned up). We have applied this standard to prohibitory injunctions, which simply bar a party from taking action that disturbs the status quo, defined as "the last peaceable uncontested status preceding the present controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 121 (2d Cir. 2014). The second, and more demanding, standard requires the movant, "in addition to demonstrating irreparable harm," to show that it has "a *clear or substantial* likelihood of success on the merits." *Mastrovincenzo*, 435 F.3d at 89 (emphasis added) (cleaned up). We have applied this standard to mandatory injunctions, which "alter the status quo by

commanding some positive act," *id.* (emphasis omitted), as well as to injunctions that "(1) would provide the plaintiff with all the relief that is sought and (2) could not be undone by a judgment favorable to defendants on the merits at trial," *id.* at 90 (cleaned up).

JLM's requested relief cannot be characterized as merely maintaining the status quo ante or prohibiting Gutman from disturbing it. The parties agree that "the last peaceable uncontested status preceding the present controversy," *Mastrio*, 768 F.3d at 121, was a moment when both JLM and Gutman had access to the Disputed Accounts. But JLM does not seek a return to shared access. It asks instead that Gutman turn over the credentials to the Disputed Accounts and give JLM exclusive control over them. As both parties recognize, that relief would change the status quo, making the injunction mandatory. JLM must therefore meet the more stringent standard to succeed on remand.[11]

2. *Restrictive Covenant*

Finally, Gutman argues that the district court impermissibly granted a preliminary injunction restricting her from identifying herself as a designer of certain products based on Paragraph 10(e) of the Contract. We agree.

_____

[11] JLM has not yet made such a showing. The district court awarded exclusive control to JLM by characterizing Gutman's prior access as derivative of her role as JLM's employee. But the question whether Gutman had access to the Disputed Accounts because they were her property or only because she was an employee goes to the crux of the parties' dispute. The district court, then, effectively assumed JLM's success on the merits. On remand, the burden is on JLM to demonstrate a clear or substantial likelihood of success.

22

As interpreted by the district court, Paragraph 10(e) is a restrictive covenant that limits Gutman's ability to work for five years following the termination of her employment with JLM. But the district court failed to consider whether the restrictive covenant was likely to be enforceable under New York law, as it was required to do before concluding that JLM was likely to succeed on its breach of contract claim under Paragraph 10(e) of the Contract.[12]

In light of the "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood," restrictive covenants are disfavored in New York and will be enforced only after careful analysis. *Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*, 42 N.Y.2d 496, 499 (1977) (quoting *Purchasing Assocs., Inc. v. Weitz*, 13 N.Y.2d 267, 272 (1963)). "[A] restrictive covenant will only be subject to specific enforcement to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389 (1999) (quoting *Reed, Roberts Assocs. v. Strauman*, 40 N.Y.2d 303, 307 (1976)).

Although protection against competition by a former employee whose services are "unique or extraordinary" may constitute a

---

[12] We affirmed an earlier iteration of the district court's preliminary injunction that ordered Gutman not to compete with JLM. *Gutman*, 24 F.4th at 795. That provision, however, was premised on Paragraph 9 of the Contract, which restricted Gutman's ability to compete *during the term of her employment*. *See id.* "[T]he availability of equitable relief against the former employee diminishes appreciably" after the term of employment ends. *See Am. Broad. Cos. v. Wolf*, 52 N.Y.2d 394, 403-04 & n.6 (1981). Our previous ruling thus provides little guidance as to the restrictive covenant before us now.

legitimate employer interest, any such restrictions must still meet *BDO Seidman*'s remaining criteria for enforcement.[13]  *Id.*  Here, the district court declined to consider those criteria.  *See Gutman*, 2023 WL 2503432, at *19 n.13.

On remand, the district court should consider (1) whether Paragraph 10(e)'s five-year term is reasonable in duration; [14] (2) whether JLM has made a sufficient showing that it has a legitimate interest warranting enforcement of a restrictive covenant; [15]  and

---

[13] Nor is it clear that the mere label "unique or extraordinary" is sufficient to constitute a legitimate interest after *BDO Seidman*.   There, the Court of Appeals was concerned with whether a former employee, alleged to be "unique or extraordinary," in fact "possessed any unique or extraordinary ability . . . that would give him a competitive advantage" over his former employer.   *BDO Seidman*, 93 N.Y.2d at 390; *see also Am. Broad. Cos.*, 52 N.Y.2d at 403 n.6.   *But see Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 70-72 (2d Cir. 1999) (enforcing, pre-*BDO Seidman*, a restrictive covenant against a unique or extraordinary employee subject only to an overarching reasonableness requirement).

[14] *See, e.g., BDO Seidman*, 93 N.Y.2d at 393; *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 507 (S.D.N.Y. 2011) (noting that ten-year restrictive covenants are consistently held unenforceable and collecting cases); *Maxon v. Franklin Traffic Serv., Inc.*, 689 N.Y.S.2d 559, 561 (4th Dep't 1999) (holding five-year noncompete unreasonable in duration); *Greenwich Mills Co. v. Barrie House Coffee Co., Inc.*, 459 N.Y.S.2d 454, 458 (2d Dep't 1983) (collecting cases striking three- and five-year restrictive covenants); *Asness v. Nelson*, 273 A.D.2d 165, 165 (N.Y. App. Div., 1st Dep't 2000) (holding a one-year noncompete reasonable in duration).

[15] *See BDO Seidman*, 93 N.Y.2d at 388-89, 391 ("[T]he only justification for imposing an employee agreement not to compete is to forestall unfair competition.   It seems self-evident that a former employee may be capable of fairly competing for an employer's clients by refraining from use of unfair means to compete. . . . [T]he employer's interest in

24

(3) whether its interpretation of the prohibition in Paragraph 10(e) is reasonable in scope and not overly burdensome on Gutman.[16]

## III.  CONCLUSION

We have considered all of Gutman's remaining arguments and found them to be without merit.   For the reasons set forth above, we (1) dismiss Gutman's appeal, No. 21-2535, from the district court's contempt order of September 8, 2021; (2) affirm the district court's March 14, 2023 order denying Gutman's motion to dissolve the preliminary injunction; and (3) affirm in part and vacate in part the district court's March 14, 2023 order modifying its preliminary injunction and remand for further proceedings consistent with this opinion.

---

preserving its client base against the competition of the former employee is no more legitimate and worthy of contractual protection than when it vies with unrelated competitors for those clients.").

[16] Specifically, the enforceability of a prohibition extending to Gutman's "tastes, voice, vision, face, and mannerisms," *Gutman*, 2023 WL 2503432, at *20, is questionable, *see BDO Seidman*, 93 N.Y.2d at 389.